# UNITED STATES *v.* ROBEL.

No. 8.  Argued November 14, 1966.—Reargued October 9, 1967.—
Decided December 11, 1967.

*Kevin T. Maroney* reargued the cause for the United States. With him on the brief on reargument were *Solicitor General Marshall, Assistant Attorney General Yeagley, John S. Martin, Jr.,* and *Lee B. Anderson,* and on the original argument *Solicitor General Marshall, Assistant Attorney General Yeagley, Nathan Lewin* and *Mrs. Anderson.*

*John J. Abt* reargued the cause for appellee. With him on the briefs on the original argument and on the reargument were *John Caughlan* and *Joseph Forer.*

*John J. Sullivan, Marvin M. Karpatkin* and *Melvin L. Wulf* filed a brief on the original argument for the American Civil Liberties Union et al., as *amici curiae,* urging affirmance.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This appeal draws into question the constitutionality of § 5 (a)(1)(D) of the Subversive Activities Control Act of 1950, 64 Stat. 992, 50 U. S. C. § 784 (a)(1)(D),[1]

---

[1] The Act was passed over the veto of President Truman. In his veto message, President Truman told Congress, "The Department of Justice, the Department of Defense, the Central Intelligence Agency, and the Department of State have all advised me that the bill would seriously damage the security and the intelligence operations for which they are responsible. They have strongly expressed

which provides that, when a Communist-action organization [2] is under a final order to register, it shall be unlawful for any member of the organization "to engage in any employment in any defense facility." In *Communist Party* v. *Subversive Activities Control Board*, 367 U. S. 1 (1961), this Court sustained an order of the SACB requiring the Communist Party of the United States to register as a Communist-action organization under the Act. The Board's order became final on October 20, 1961. At that time appellee, a member of the Communist Party, was employed as a machinist at the Seattle, Washington, shipyard of Todd Shipyards Corporation. On August 20, 1962, the Secretary of Defense, acting under authority delegated by § 5 (b) of the Act, designated that shipyard a "defense facility." Appellee's continued employment at the shipyard after that date subjected him to prosecution under § 5 (a)(1)(D), and on May 21, 1963, an indictment was filed charging him with a violation of that section. The indictment alleged in substance that appellee had "unlawfully and willfully engage[d] in employment" at the shipyard with knowledge of the outstanding order against the Party and with knowledge and notice of the shipyard's designation as

the hope that the bill would not become law." H. R. Doc. No. 708, 81st Cong., 2d Sess., 1 (1950).

President Truman also observed that "the language of the bill is so broad and vague that it might well result in penalizing the legitimate activities of people who are not Communists at all, but loyal citizens." *Id.*, at 3.

[2] Section 3 (3)(a) of the Act, 50 U. S. C. § 782 (3)(a), defines a "Communist-action organization" as:

"any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement . . . and (ii) operates primarily to advance the objectives of such world Communist movement . . . ."

a defense facility by the Secretary of Defense. The United States District Court for the Western District of Washington granted appellee's motion to dismiss the indictment on October 4, 1965. To overcome what it viewed as a "likely constitutional infirmity" in § 5 (a) (1)(D), the District Court read into that section "the requirements of active membership and specific intent." Because the indictment failed to allege that appellee's Communist Party membership was of that quality, the indictment was dismissed. The Government, unwilling to accept that narrow construction of § 5 (a)(1)(D) and insisting on the broadest possible application of the statute,[3] initially took its appeal to the Court of Appeals for the Ninth Circuit. On the Government's motion, the case was certified here as properly a direct appeal to this Court under 18 U. S. C. § 3731. We noted probable jurisdiction. 384 U. S. 937.[4] We affirm the judgment of the District Court, but on the ground that § 5 (a) (1)(D) is an unconstitutional abridgment of the right of association protected by the First Amendment.[5]

---

[3] The Government has persisted in this view in its arguments to this Court. Brief for the Government 48–56.

[4] We initially heard oral argument in this case on November 14, 1966. On June 5, 1967, we entered the following order:

"Case is restored to the calendar for reargument and counsel are directed to brief and argue, in addition to the questions presented, the question whether the delegation of authority to the Secretary of Defense to designate 'defense facilities' satisfies pertinent constitutional standards." 387 U. S. 939.

We heard additional arguments on October 9, 1967.

[5] In addition to arguing that § 5 (a)(1)(D) is invalid under the First Amendment, appellee asserted the statute was also unconstitutional because (1) it offended substantive and procedural due process under the Fifth Amendment; (2) it contained an unconstitutional delegation of legislative power to the Secretary of Defense; and (3) it is a bill of attainder. Because we agree that the statute is contrary to the First Amendment, we find it unnecessary to consider the other constitutional arguments.

We cannot agree with the District Court that § 5 (a) (1)(D) can be saved from constitutional infirmity by limiting its application to active members of Communist-action organizations who have the specific intent of furthering the unlawful goals of such organizations. The District Court relied on *Scales* v. *United States,* 367 U. S. 203 (1961), in placing its limiting construction on § 5 (a) (1)(D). It is true that in *Scales* we read the elements of active membership and specific intent into the membership clause of the Smith Act.[6] However, in *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964), we noted that the Smith Act's membership clause required a defendant to have knowledge of the organization's illegal advocacy, a requirement that "was intimately connected with the construction limiting membership to 'active' members." *Id.,* at 511, n. 9. *Aptheker* involved a challenge to § 6 of the Subversive Activities Control Act, 50 U. S. C. § 785, which provides that, when a Communist organization is registered or under a final order to register, it shall be unlawful for any member thereof with knowledge or notice thereof to apply for a passport. We held that "[t]he clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting." *Id.,* at 515. We take the same view of § 5 (a)(1)(D). It is precisely because that statute sweeps indiscriminately across all types of association with Communist-action groups, without regard to the quality and degree of membership, that it runs afoul of the First Amendment.

In *Aptheker,* we held § 6 unconstitutional because it too broadly and indiscriminately infringed upon constitutionally protected rights. The Government has argued that,. despite the overbreadth which is obvious on the face of § 5 (a)(1)(D), *Aptheker* is not controlling in

---

[6] 18 U. S. C. § 2385.

this case because the right to travel is a more basic freedom than the right to be employed in a defense facility. We agree that *Aptheker* is not controlling since it was decided under the Fifth Amendment. But we cannot agree with the Government's characterization of the essential issue in this case. It is true that the specific disability imposed by § 5 (a)(1)(D) is to limit the employment opportunities of those who fall within its coverage, and such a limitation is not without serious constitutional implications. See *Greene* v. *McElroy,* 360 U. S. 474, 492 (1959). But the operative fact upon which the job disability depends is the exercise of an individual's right of association, which is protected by the provisions of the First Amendment.[7] Wherever one would place the right to travel on a scale of constitutional values, it is clear that those rights protected by the First Amendment are no less basic in our democratic scheme.

The Government seeks to defend the statute on the ground that it was passed pursuant to Congress' war power. The Government argues that this Court has given broad deference to the exercise of that constitutional power by the national legislature. That argument finds support in a number of decisions of this Court.[8] However, the phrase "war power" cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit.

---

[7] Our decisions leave little doubt that the right of association is specifically protected by the First Amendment. *E. g., Aptheker* v. *Secretary of State, supra,* at 507; *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 543 (1963); *Bates* v. *City of Little Rock,* 361 U. S. 516, 522–523 (1960); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958). See generally Emerson, Freedom of Association and Freedom of Expression, 74 Yale L. J. 1 (1964).

[8] See, *e. g., Lichter* v. *United States,* 334 U. S. 742, 754–772 (1948); *Hirabayashi* v. *United States,* 320 U. S. 81, 93 (1943).

"[E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426 (1934). More specifically in this case, the Government asserts that § 5 (a)(1)(D) is an expression "of the growing concern shown by the executive and legislative branches of government over the risks of internal subversion in plants on which the national defense depend[s]." [9] Yet, this concept of "national defense" cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile.

When Congress' exercise of one of its enumerated powers clashes with those individual liberties protected by the Bill of Rights, it is our "delicate and difficult task" to determine whether the resulting restriction on freedom can be tolerated. See *Schneider* v. *State,* 308 U. S. 147, 161 (1939). The Government emphasizes that the purpose of § 5 (a)(1)(D) is to reduce the threat of sabotage and espionage in the Nation's defense plants. The Government's interest in such a prophylactic measure is not insubstantial. But it cannot be doubted that the means chosen to implement that governmental purpose in this instance cut deeply into the right of association. Section 5 (a)(1)(D) put appellee to the choice of surrender-

---

[9] Brief for the Government 15.

ing his organizational affiliation, regardless of whether his membership threatened the security of a defense facility,[10] or giving up his job.[11] When appellee refused to make that choice, he became subject to a possible criminal penalty of five years' imprisonment and a $10,000 fine.[12] The statute quite literally establishes guilt by association alone, without any need to establish that an individual's association poses the threat feared by the Government in proscribing it.[13] The inhibiting effect on the exercise of First Amendment rights is clear.

It has become axiomatic that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); see *Aptheker* v. *Secretary of State,* 378 U. S. 500, 512–513; *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960). Such precision is notably lacking in § 5 (a)(1)(D). That statute casts its net across a

---

[10] The appellee has worked at the shipyard, apparently without incident and apparently without concealing his Communist Party membership, for more than 10 years. And we are told that, following appellee's indictment and arrest, "he was released on his own recognizance, and immediately returned to his job as a machinist at the Todd Shipyards, where he has worked ever since." Brief for Appellee 6, n. 8. As far as we can determine, appellee is the only individual the Government has attempted to prosecute under § 5 (a)(1)(D).

[11] We recognized in *Greene* v. *McElroy,* 360 U. S., at 492, that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment."

[12] 50 U. S. C. § 794 (c).

[13] The Government has insisted that Congress, in enacting § 5 (a)(1)(D), has not sought "to punish membership in 'Communist-action' . . . organizations." Brief for the Government 53. Rather, the Government asserts, Congress has simply sought to regulate access to employment in defense facilities. But it is clear the employment disability is imposed only because of such membership.

broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished [14] and membership which cannot be so proscribed.[15] It is made irrelevant to the statute's operation that an individual may be a passive or inactive member of a designated organization, that he may be unaware of the organization's unlawful aims, or that he may disagree with those unlawful aims.[16] It is also made irrelevant that an individual who is subject to the penalties of § 5 (a)(1)(D) may occupy a nonsensitive position in a defense facility.[17] Thus, § 5 (a)(1)(D) contains the fatal defect of overbreadth because it seeks to bar employment both for association which may be proscribed and for association which may not be proscribed consistently with First Amendment rights. See *Elfbrandt* v. *Russell,* 384 U. S. 11; *Aptheker* v. *Secretary of State, supra; NAACP* v. *Alabama ex rel. Flowers,* 377 U. S. 288 (1964); *NAACP* v. *Button, supra.* This the Constitution will not tolerate.

We are not unmindful of the congressional concern over the danger of sabotage and espionage in national defense industries, and nothing we hold today should be read to deny Congress the power under narrowly drawn legislation to keep from sensitive positions in defense

---

[14] See *Scales* v. *United States,* 367 U. S. 203 (1961).

[15] See *Elfbrandt* v. *Russell,* 384 U. S. 11 (1966).

[16] A number of complex motivations may impel an individual to align himself with a particular organization. See *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 562–565 (1963) (concurring opinion). It is for that reason that the mere presence of an individual's name on an organization's membership rolls is insufficient to impute to him the organization's illegal goals.

[17] See *Cole* v. *Young,* 351 U. S. 536, 546 (1956): "[I]t is difficult to justify summary suspensions and unreviewable dismissals on loyalty grounds of employees who are not in 'sensitive' positions and who are thus not situated where they could bring about any discernible adverse effects on the Nation's security."

facilities those who would use their positions to disrupt the Nation's production facilities. We have recognized that, while the Constitution protects against invasions of individual rights, it does not withdraw from the Government the power to safeguard its vital interests. *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 160 (1963). Spies and saboteurs do exist, and Congress can, of course, prescribe criminal penalties for those who engage in espionage and sabotage.[18] The Government can deny access to its secrets to those who would use such information to harm the Nation.[19] And Congress can declare sensitive positions in national defense industries off limits to those who would use such positions to disrupt the production of defense materials. The Government has told us that Congress, in passing § 5 (a)(1)(D), made a considered judgment that one possible alternative to that statute— an industrial security screening program—would be inadequate and ineffective to protect against sabotage in defense facilities. It is not our function to examine the validity of that congressional judgment. Neither is it our function to determine whether an industrial security screening program exhausts the possible alternatives to the statute under review. We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake. The task of writing legislation which will stay within those bounds has been committed to Congress. Our decision today

---

[18] Congress has already provided stiff penalties for those who conduct espionage and sabotage against the United States. 18 U. S. C. §§ 792–798 (espionage); §§ 2151–2156 (sabotage).

[19] The Department of Defense, pursuant to Executive Order 10865, as amended by Executive Order 10909, has established detailed procedures for screening those working in private industry who, because of their jobs, must have access to classified defense information. 32 CFR Part 155. The provisions of those regulations are not before the Court in this case.

simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms.[20]  *Shelton* v. *Tucker, supra;* cf. *United States* v. *Brown,* 381 U. S. 437, 461 (1965).  The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less.

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[20] It has been suggested that this case should be decided by "balancing" the governmental interests expressed in § 5 (a) (1) (D) against the First Amendment rights asserted by the appellee.  This we decline to do.  We recognize that both interests are substantial, but we deem it inappropriate for this Court to label one as being more important or more substantial than the other.  Our inquiry is more circumscribed.  Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal.  In making this determination we have found it necessary to measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment.  But we have in no way "balanced" those respective interests.  We have ruled only that the Constitution requires that the conflict between congressional power and individual rights be accommodated by legislation drawn more narrowly to avoid the conflict.  There is, of course, nothing novel in that analysis.  Such a course of adjudication was enunciated by Chief Justice Marshall when he declared: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, *which are not prohibited, but consist with the letter and spirit of the constitution,* are constitutional."  *M'Culloch* v. *Maryland,* 4 Wheat. 316, 421 (1819) (emphasis added).  In this case, the means chosen by Congress are contrary to the "letter and spirit" of the First Amendment.

Mr. Justice Brennan, concurring in the result.

I too agree that the judgment of the District Court should be affirmed but I reach that result for different reasons.

Like the Court, I disagree with the District Court that § 5 (a)(1)(D) can be read to apply only to active members who have the specific intent to further the Party's unlawful objectives. In *Aptheker* v. *Secretary of State,* 378 U. S. 500, we rejected that reading of § 6 of the Act which provides that, when a Communist organization is registered or under final order to register, it shall be unlawful for any member thereof with knowledge or notice of the order to apply for or use a passport. We held that "[t]he clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting." 378 U. S., at 515. I take the same view of § 5 (a)(1)(D).

*Aptheker* held § 6 of the Act overbroad in that it deprived Party members of the right to travel without regard to whether they were active members of the Party or intended to further the Party's unlawful objectives, and therefore invalidly abridged, on the basis of political associations, the members' constitutionally protected right to travel. Section 5 (a)(1)(D) also treats as irrelevant whether or not the members are active, or know the Party's unlawful purposes, or intend to pursue those purposes. Compare *Keyishian* v. *Board of Regents,* 385 U. S. 589; *Elfbrandt* v. *Russell,* 384 U. S. 11, 17; *Scales* v. *United States,* 367 U. S. 203; *Schneiderman* v. *United States,* 320 U. S. 118, 136. Indeed, a member such as appellee, who has worked at the Todd Shipyards without complaint or known ground for suspicion for over 10 years, is afforded no opportunity to prove that the statute's presumption that he is a security risk is invalid as applied to him. And no importance whatever is attached to the sensitivity of the jobs held by Party mem-

bers, a factor long considered relevant in security cases.[1] Furthermore, like § 6, § 5 (a)(1)(D) affects constitutionally protected rights. "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . ." *Greene* v. *McElroy,* 360 U. S. 474, 492. That right is therefore also included among the "[i]ndividual liberties fundamental to American institutions [which] are not to be destroyed under pretext of preserving those institutions, even from the gravest external dangers." *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1, 96. Since employment opportunities are denied by § 5 (a)(1)(D) simply on the basis of political associations the statute also has the potential of curtailing free expression by inhibiting persons from establishing or retaining such associations. See *Wieman* v. *Updegraff,* 344 U. S. 183, 191. "Broad prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone in . . . area[s] so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438; see *Shelton* v. *Tucker,* 364 U. S. 479, 488; *Cantwell* v. *Connecticut,* 310 U. S. 296, 304.

It is true, however, as the Government points out, that Congress often regulates indiscriminately, through preventive or prophylactic measures, *e. g., Board of Governors* v. *Agnew,* 329 U. S. 441; *North American Co.* v. *SEC,* 327 U. S. 686, and that such regulation has been upheld even where fundamental freedoms are potentially affected, *Hirabayashi* v. *United States,* 320 U. S. 81;

---

[1] See *Cole* v. *Young,* 351 U. S. 536, 546:
"[I]t is difficult to justify summary suspensions and unreviewable dismissals on loyalty grounds of employees who are not in 'sensitive' positions and who are thus not situated where they could bring about any discernible adverse effects on the Nation's security."

*Cafeteria Workers* v. *McElroy,* 367 U. S. 886; *Carlson* v. *Landon,* 342 U. S. 524. Each regulation must be examined in terms of its potential impact upon fundamental rights, the importance of the end sought and the necessity for the means adopted. The Government argues that § 5 (a)(1)(D) may be distinguished from § 6 on the basis of these factors. Section 5 (a)(1)(D) limits employment only in "any defense facility," while § 6 deprived every Party member of the right to apply for or to hold a passport. If § 5 (a)(1)(D) were in fact narrowly applied, the restrictions it would place upon employment are not as great as those placed upon the right to travel by § 6.[2] The problems presented by the employment of Party members at defense facilities, moreover, may well involve greater hazards to national security than those created by allowing Party members to travel abroad. We may assume, too, that Congress may have been justified in its conclusion that alternatives to § 5 (a)(1)(D) were inadequate.[3] For these reasons,

---

[2] The Government also points out that § 5 (a)(1)(D) applies only to members of "Communist-action" organizations, while § 6 applied also to members of "Communist-front" organizations, groups which the Government contends are less dangerous to the national security under Congress' definitions, and whose members are therefore presumably less dangerous. This distinction is, however, open to some doubt. Even if a "front" organization, which is defined as an organization either dominated by or primarily operated for the purpose of aiding and supporting "action" organizations, could in some fashion be regarded as less dangerous, *Aptheker* held § 6 invalid because it failed to discriminate among affected persons on the bases of their activity and commitment to unlawful purposes, and nothing in the opinion indicates the result would have been different if Congress had been indiscriminate in these respects with regard only to "Communist-action" group members.

[3] The choice of a prophylactic measure "must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton* v. *Tucker,* 364 U. S. 479, 488. Since I would affirm on another ground, however, I put aside the question whether existing

I am not persuaded to the Court's view that overbreadth is fatal to this statute, as I agreed it was in other contexts; see, *e. g., Keyishian* v. *Board of Regents,* 385 U. S. 589; *Elfbrandt* v. *Russell,* 384 U. S. 11; *Aptheker* v. *Secretary of State,* 378 U. S. 500; *NAACP* v. *Button,* 371 U. S. 415.

However, acceptance of the validity of these distinctions and recognition of congressional power to utilize a prophylactic device such as § 5 (a)(1)(D) to safeguard against espionage and sabotage at essential defense facilities, would not end inquiry in this case. Even if the statute is not overbroad on its face—because there may be "defense facilities" so essential to our national security that Congress could constitutionally exclude all Party members from employment in them—the congressional delegation of authority to the Secretary of Defense to designate "defense facilities" creates the danger of overbroad, unauthorized, and arbitrary application of criminal sanctions in an area of protected freedoms and therefore, in my view, renders this statute invalid. Because the statute contains no meaningful standard by which the Secretary is to govern his desig-

security programs were inadequate to prevent serious, possibly catastrophic consequences.

Congress rejected suggestions of the President and the Department of Justice that existing security programs were adequate with only slight modifications. See H. R. Doc. No. 679, 81st Cong., 2d Sess., 5 (1950); Hearings on Legislation to Outlaw Certain Un-American and Subversive Activities before the House Un-American Activities Committee, 81st Cong., 2d Sess., 2122–2125 (1950). Those programs cover most of the facilities within the reach of § 5 (a)(1)(D) and make Party membership an important factor governing access. 32 CFR § 155.5. They provide measures to prevent and punish subversive acts. The Department of Defense, moreover, had screened some 3,000,000 defense contractor employees under these procedures by 1956, Brown, Loyalty and Security 179–180 (1958), thereby providing at least some evidence of its capacity to handle this problem in a more discriminating manner.

nations, and no procedures to contest or review his designations, the "defense facility" formulation is constitutionally insufficient to mark "the field within which the [Secretary] is to act so that it may be known whether he has kept within it in compliance with the legislative will." *Yakus* v. *United States,* 321 U. S. 414, 425.

The Secretary's role in designating "defense facilities" is fundamental to the potential breadth of the statute, since the greater the number and types of facilities designated, the greater is the indiscriminate denial of job opportunities, under threat of criminal punishment, to Party members because of their political associations. A clear, manageable standard might have been a significant limitation upon the Secretary's discretion. But the standard under which Congress delegated the designating power is so indefinite as to be meaningless. The statute defines "facility" broadly enough to include virtually every place of employment in the United States; the term includes "any plant, factory or other manufacturing, producing or service establishment, airport, airport facility, vessel, pier, water-front facility, mine, railroad, public utility, laboratory, station, or other establishment or facility, or any part, division, or department of any of the foregoing." 50 U. S. C. § 782 (7). And § 5 (b) grants the Secretary of Defense untrammelled discretion to designate as a "defense facility" any facility "with respect to the operation of which he finds and determines that the security of the United States requires . . ." that Party members should not be employed there. Congress could easily have been more specific.[4] Instead, Congress left the Secretary completely

---

[4] Congress, in fact, originally proposed to limit the Secretary's discretion in designating "defense facilities." H. R. 9490, passed by both the House and Senate, provided that the Secretary should determine and designate each "defense plant" as defined in § 3 (7) of the Act. The difference between that version and § 5 (a) (1) (D)

at large in determining the relevance and weight to be accorded such factors as the importance and secrecy of the facility and of the work being done there, and the indispensability of the facility's service or product to the national security.

Congress ordinarily may delegate power under broad standards. *E. g., Dakota Central Tel. Co.* v. *South Dakota,* 250 U. S. 163, 183; *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591; *NBC* v. *United States,* 319 U. S. 190. No other general rule would be feasible or desirable. Delegation of power under general directives is an inevitable consequence of our complex society, with its myriad, ever changing, highly technical problems. "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality . . . to perform its function . . . ." *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421; *Currin* v. *Wallace,* 306 U. S. 1, 15. It is generally enough that, in conferring power upon an appropriate authority, Congress

---

adopted at conference is commented upon in H. R. Conf. Rep. No. 3112, 81st Cong., 2d Sess., 50 (1950):

"Under section 3 (7) a defense plant was defined as any plant, factory, or other manufacturing or service establishment, or any part thereof, engaged in the production or furnishing, for the use of the Government of any commodity or service determined and designated by the Secretary of Defense to be of such character as to affect the military security of the United States.

"Section 3 (7), and the provisions of section 5 relating to the designation of defense plants by the Secretary of Defense, have been modified in the conference substitute so as to broaden the concept of defense plants to cover any appropriately designated plant, factory or other manufacturing, producing, or service establishment, airport, airport facility, vessel, pier, water-front facility, mine, railroad, public utility, laboratory, station, or other establishment or facility, or any part, division, or department of any of the foregoing. Because of this broader coverage, section 3 (7) has been changed so as to define the two terms 'facility' and 'defense facility.'"

indicate its general policy, and act in terms or within a context which limits the power conferred. See, *e. g.,* *Arizona* v. *California,* 373 U. S. 546, 584–585; *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86; *Lichter* v. *United States,* 334 U. S. 742; *Yakus* v. *United States, supra,* at 424; *Bandini Petroleum Co.* v. *Superior Court,* 284 U. S. 8; *FTC* v. *Gratz,* 253 U. S. 421; *Buttfield* v. *Stranahan,* 192 U. S. 470. Given such a situation, it is possible for affected persons, within the procedural structure usually established for the purpose, to be heard by the implementing agency and to secure meaningful review of its action in the courts, and for Congress itself to review its agent's action to correct significant departures from Congress' intention.

The area of permissible indefiniteness narrows, however, when the regulation invokes criminal sanctions and potentially affects fundamental rights, as does § 5 (a)(1)(D). See *Barenblatt* v. *United States,* 360 U. S. 109, 140, n. 7 (BLACK, J., dissenting). This is because the numerous deficiencies connected with vague legislative directives, whether to a legislative committee, *United States* v. *Rumely,* 345 U. S. 41; to an executive officer, *Panama Refining Co.* v. *Ryan,* 293 U. S. 388; to a judge and jury, *Cline* v. *Frink Dairy Co.,* 274 U. S. 445, 465; or to private persons, *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58; see *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495; are far more serious when liberty and the exercise of fundamental rights are at stake. See also *Gojack* v. *United States,* 384 U. S. 702; *Kunz* v. *New York,* 340 U. S. 290; *Winters* v. *New York,* 333 U. S. 507; *Thornhill* v. *Alabama,* 310 U. S. 88; *Hague* v. *CIO,* 307 U. S. 496; *Herndon* v. *Lowry,* 301 U. S. 242.

*First.* The failure to provide adequate standards in § 5 (a)(1)(D) reflects Congress' failure to have made a "legislative judgment," *Cantwell* v. *Connecticut,* 310

U. S., at 307, on the extent to which the prophylactic measure should be applied. Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsive in the same degree to the people. "[S]tandards of permissible statutory vagueness are strict . . ." in protected areas. *NAACP* v. *Button,* 371 U. S., at 432. "Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them." *Greene* v. *McElroy,* 360 U. S. 474, 507.

Congress has the resources and the power to inform itself, and is the appropriate forum where the conflicting pros and cons should have been presented and considered. But instead of a determination by Congress reflected in guiding standards of the types of facilities to which § 5 (a)(1)(D) should be applied, the statute provides for a resolution by the Secretary of Defense acting on his own accord. It is true that the Secretary presumably has at his disposal the information and expertise necessary to make reasoned judgments on which facilities are important to national security. But that is not the question to be resolved under this statute. Compare *Hague* v. *CIO,* 307 U. S. 496. Rather, the Secretary is in effect determining which facilities are so important to the national security that Party members, active or inactive, well- or ill-intentioned, should be prohibited from working within them in any capacity, sensitive or innocuous, under threat of criminal prosecution. In resolving this conflict of interests, the Secretary's judgment, colored by his overriding obligation to protect the national defense, is not

a constitutionally acceptable substitute for Congress' judgment, in the absence of further, limiting guidance.[5]

The need for a legislative judgment is especially acute here, since it is imperative when liberty and the exercise of fundamental freedoms are involved that constitutional rights not be unduly infringed. *Cantwell* v. *Connecticut, supra,* at 304. Before we can decide whether it is an undue infringement of protected rights to send a person to prison for holding employment at a certain type of facility, it ought at least to appear that Congress authorized the proscription as warranted and necessary. Such congressional determinations will not be assumed. "They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized . . . but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Greene* v. *McElroy, supra,* at 507.

*Second.* We said in *Watkins* v. *United States,* 354 U. S. 178, 205, that Congress must take steps to assure "respect

[5] The Secretary has published criteria which guide him in applying the statute:

"The list of 'defense facilities' is comprised of (1) facilities engaged in important classified military projects; (2) facilities producing important weapons systems, subassemblies and their components; (3) facilities producing essential common components, intermediates, basic materials and raw materials; (4) important utility and service facilities; and (5) research laboratories whose contributions are important to the national defense. The list, which will be amended from time to time as necessary, has been classified for reasons of security."

Department of Defense Release No. 1363–62, Aug. 20, 1962. These broad standards, which might easily justify applying the statute to most of our major industries, cannot be read into the statute to limit the Secretary's discretion, since they are subject to unreviewable amendment.

for constitutional liberties" by preventing the existence of "a wide gulf between the responsibility for the use of . . . power and the actual exercise of that power." Procedural protections to avoid that gulf have been recognized as essential when fundamental freedoms are regulated, *Speiser* v. *Randall,* 357 U. S. 513; *Marcus* v. *Search Warrant,* 367 U. S. 717, 730; *A Quantity of Copies of Books* v. *Kansas,* 378 U. S. 205, 213; even when Congress acts pursuant to its "great powers," *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 164. Without procedural safeguards, regulatory schemes will tend through their indiscriminate application to inhibit the activity involved. See *Marcus* v. *Search Warrant, supra,* at 734–735.

It is true that "[a] construction of the statute which would deny all opportunity for judicial determination of an asserted constitutional right is not to be favored." *Lockerty* v. *Phillips,* 319 U. S. 182, 188. However, the text and history of this section compel the conclusion that Congress deliberately chose not to provide for protest either to the Secretary or the courts from any designation by the Secretary of a facility as a "defense facility." The absence of any provision in this regard contrasts strongly with the care that Congress took to provide for the determination by the SACB that the Party is a Communist-action organization, and for judicial review of that determination. The Act "requires the registration only of organizations which . . . are found to be under the direction, domination, or control of certain foreign powers and to operate primarily to advance certain objectives. This finding must be made after full administrative hearing, subject to judicial review which opens the record for the reviewing court's determination whether the administrative findings as to fact are supported by the preponderance of the evidence." *Communist Party* v. *Subversive Activities Control Board,*

*supra,* at 86–87.  In contrast, the Act nowhere provides for an administrative hearing on the Secretary's designation, either public or private, nor is his finding subject to review.  A Party member charged with notice of the designation must quit the Party or his job; he cannot contest the Secretary's action on trial if he retains both and is prosecuted.[6]

This is persuasive evidence that the matter of the designation of "defense facilities" was purposely committed by Congress entirely to the discretionary judgment of the Secretary.  Unlike the opportunities for hearing and judicial review afforded the Party itself, the Party member was not to be heard by the Secretary to protest the designation of his place of employment as a "defense facility," nor was the member to have recourse to the courts.  This pointed distinction, as in the case of the statute before the Court in *Schilling* v. *Rogers,* 363 U. S. 666, 674, is compelling evidence "that in this Act Congress was advertent to the role of courts, and an absence in any specific area of any kind of provision for judicial participation strongly indicates a legislative purpose that there be no such participation."  This clear indication of the congressional plan, coupled

---

[6] The statute contemplates only four significant findings before criminal liability attaches:  (1) that the Communist Party is a "Communist-action organization";  (2) that defendant is a member of the Communist Party;  (3) that defendant is engaged in employment at a "defense facility";  and (4) that he had notice that his place of employment was a "defense facility."  The first finding was made by the Subversive Activities Control Board.  The third finding—that the shipyard is a "defense facility"—was made by the Secretary of Defense.  The fourth finding refers to the notice requirement which is no more than a presumption from the posting required of the employer by § 5 (b).  Thus the only issue which a defendant can effectively contest is whether he is a Communist Party member.  In view of the result which I would reach, however, I need not consider appellee's argument that this affords defendants only the shadow of a trial, and violates due process.

with a flexibility—as regards the boundaries of the Secretary's discretion—so unguided as to be entirely unguiding, must also mean that Congress contemplated that an affected Party member was not to be heard to contend even at his criminal trial that the Secretary acted beyond the scope of his powers, or that the designation of the particular facility was arbitrary and capricious. Cf. *Estep* v. *United States,* 327 U. S. 114.

The legislative history of the section confirms this conclusion. That history makes clear that Congress was concerned that neither the Secretary's reasons for a designation nor the fact of the designation should be publicized. This emerged after President Truman vetoed the statute. In its original form the Act required the Secretary to "designate and proclaim, and from time to time revise, a list of facilities . . . to be promptly published in the Federal Register . . . ." § 5 (b). The President commented in his veto message, "[s]pies and saboteurs would willingly spend years of effort seeking to find out the information that this bill would require the Government to hand them on a silver platter." H. R. Doc. No. 708, 81st Cong., 2d Sess., 2 (1950). Shortly after this Court sustained the registration provisions of the Act in *Communist Party* v. *Subversive Activities Control Board, supra,* the Act was amended at the request of the Secretary to eliminate the requirement that the list of designated facilities be published in the Federal Register. 76 Stat. 91. Instead, the list is classified information. Whether or not such classification is practically meaningful—in light of the fact that notice of a designation must be posted in the designated facility— the history is persuasive against any congressional intention to provide for hearings or judicial review that might be attended with undesired publicity. We are therefore not free to imply limitations upon the Secretary's discretion or procedural safeguards that Congress obviously

chose to omit. Compare *Cole* v. *Young,* 351 U. S. 536; *United States* v. *Rumely, supra; Ex parte Endo,* 323 U. S. 283, 299; *Japanese Immigrant Case,* 189 U. S. 86, 101; see *Greene* v. *McElroy, supra,* at 507.

*Third.* The indefiniteness of the delegation in this case also results in inadequate notice to affected persons. Although the form of notice provided for in § 5 (b) affords affected persons reasonable opportunity to conform their behavior to avoid punishment, it is not enough that persons engaged in arguably protected activity be reasonably well advised that their actions are subject to regulation. Persons so engaged must not be compelled to conform their behavior to commands, no matter how unambiguous, from delegated agents whose authority to issue the commands is unclear. *Marcus* v. *Search Warrant, supra,* at 736. The legislative directive must delineate the scope of the agent's authority so that those affected by the agent's commands may know that his command is within his authority and is not his own arbitrary fiat. *Cramp* v. *Board of Public Instruction,* 368 U. S. 278; *Scull* v. *Virginia,* 359 U. S. 344; *Watkins* v. *United States, supra,* at 208–209. There is no way for persons affected by § 5 (a)(1)(D) to know whether the Secretary is acting within his authority, and therefore no fair basis upon which they may determine whether or not to risk disobedience in the exercise of activities normally protected.

Section 5 (a)(1)(D) denies significant employment rights under threat of criminal punishment to persons simply because of their political associations. The Government makes no claim that Robel is a security risk. He has worked as a machinist at the shipyards for many years, and we are told is working there now. We are in effect invited by the Government to assume that Robel is a law abiding citizen, earning a living at his chosen trade. The justification urged for punishing him is that

Congress may properly conclude that members of the Communist Party, even though nominal or inactive members and believing only in change through lawful means, are more likely than other citizens to engage in acts of espionage and sabotage harmful to our national security. This may be so. But in areas of protected freedoms, regulation based upon mere association and not upon proof of misconduct or even of intention to act unlawfully, must at least be accompanied by standards or procedural protections sufficient to safeguard against indiscriminate application. "If . . . 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress . . . [a]nd if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests." *Kent* v. *Dulles,* 357 U. S. 116, 129.

Mr. Justice White, with whom Mr. Justice Harlan joins, dissenting.

The Court holds that because of the First Amendment a member of the Communist Party who knows that the Party has been held to be a Communist-action organization may not be barred from employment in defense establishments important to the security of the Nation. It therefore refuses to enforce the contrary judgments of the Legislative and Executive Branches of the Government. Respectfully disagreeing with this view, I dissent.

The constitutional right found to override the public interest in national security defined by Congress is the right of association, here the right of appellee Robel to remain a member of the Communist Party after being notified of its adjudication as a Communist-action organization. Nothing in the Constitution requires this result. The right of association is not mentioned in the Constitution. It is a judicial construct appended to the First Amendment rights to speak freely, to assemble, and

to petition for redress of grievances.[1] While the right of association has deep roots in history and is supported by the inescapable necessity for group action in a republic as large and complex as ours, it has only recently blossomed as the controlling factor in constitutional litigation; its contours as yet lack delineation. Although official interference with First Amendment rights has drawn close scrutiny, it is now apparent that the right of association is not absolute and is subject to significant regulation by the State. The law of criminal conspiracy restricts the purposes for which men may associate and

---

[1] If men may speak as individuals, they may speak in groups as well. If they may assemble and petition, they must have the right to associate to some extent. In this sense the right of association simply extends constitutional protection to First Amendment rights when exercised with others rather than by an individual alone. In *NAACP* v. *Alabama,* the Court said that the freedom to associate for the advancement of beliefs and ideas is constitutionally protected and that it is "immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters . . . ." 357 U. S. 449, 460 (1958). That case involved the propagation of ideas by a group as well as litigation as a form of petition. The latter First Amendment element was also involved in *NAACP* v. *Button,* 371 U. S. 415 (1963); *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1 (1964); and *United Mine Workers* v. *Illinois Bar Assn., ante,* p. 217. The activities in *Eastern R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961), although commercially motivated, were aimed at influencing legislative action. Whether the right to associate is an independent First Amendment right carrying its own credentials and will be carried beyond the implementation of other First Amendment rights awaits a definitive answer. In this connection it should be noted that the Court recently dismissed, as not presenting a substantial federal question, an appeal challenging Florida regulations which forbid a Florida accountant from associating in his work, whether as partner or employee, with any nonresident accountant; out-of-state associations are barred from the State unless every partner is a qualified Florida accountant, and in practice only Florida residents can become qualified there. *Mercer* v. *Hemmings, ante,* p. 46.

284

the means they may use to implement their plans. Labor unions, and membership in them, are intricately controlled by statutes, both federal and state, as are political parties and corporations.

The relevant cases uniformly reveal the necessity for accommodating the right of association and the public interest. *NAACP* v. *Alabama,* 357 U. S. 449 (1958), which contained the first substantial discussion of the right in an opinion of this Court, exemplifies the judicial approach. There, after noting the impact of official action on the right to associate, the Court inquired "whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association." 357 U. S., at 463. The same path to decision is evident in *Bates* v. *City of Little Rock,* 361 U. S. 516 (1960); *NAACP* v. *Button,* 371 U. S. 415 (1963); and *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1 (1964). Only last week, in *United Mine Workers* v. *Illinois Bar Assn., ante,* p. 217, the Court weighed the right to associate in an organization furnishing salaried legal services to its members against the State's interest in insuring adequate and personal legal representation, and found the State's interest insufficient to justify its restrictions.

Nor does the Court mandate a different course in this case. Apparently "active" members of the Communist Party who have demonstrated their commitment to the illegal aims of the Party may be barred from defense facilities. This exclusion would have the same deterrent effect upon associational rights as the statute before us, but the governmental interest in security would override that effect. Also, the Court would seem to permit barring appellee, although not an "active" member of the

Party, from employment in "sensitive" positions in the defense establishment. Here, too, the interest in anticipating and preventing espionage or sabotage would outweigh the deterrent impact of job disqualification. If I read the Court correctly, associating with the Communist Party may at times be deterred by barring members from employment and nonmembership may at times be imposed as a condition of engaging in defense work. In the case before us the Court simply disagrees with the Congress and the Defense Department, ruling that Robel does not present a sufficient danger to the national security to require him to choose between membership in the Communist Party and his employment in a defense facility. Having less confidence than the majority in the prescience of this remote body when dealing with threats to the security of the country, I much prefer the judgment of Congress and the Executive Branch that the interest of appellee in remaining a member of the Communist Party, knowing that it has been adjudicated a Communist-action organization, is less substantial than the public interest in excluding him from employment in critical defense industries.

The national interest asserted by the Congress is real and substantial. After years of study, Congress prefaced the Subversive Activities Control Act of 1950, 64 Stat. 987, 50 U. S. C. §§ 781–798, with its findings that there exists an international Communist movement which by treachery, deceit, espionage, and sabotage seeks to overthrow existing governments; that the movement operates in this country through Communist-action organizations which are under foreign domination and control and which seek to overthrow the Government by any necessary means, including force and violence; that the Communist movement in the United States is made up of thousands of adherents, rigidly disciplined, operating in secrecy, and employing espionage and sabotage tactics

in form and manner evasive of existing laws. Congress therefore, among other things, defined the characteristics of Communist-action organizations, provided for their adjudication by the SACB, and decided that the security of the United States required the exclusion of Communist-action organization members from employment in certain defense facilities. After long and complex litigation, the SACB found the Communist Party to be a Communist-action organization within the meaning of the Act. That conclusion was affirmed both by the Court of Appeals, *Communist Party* v. *Subversive Activities Control Board,* 107 U. S. App. D. C. 279, 277 F. 2d 78 (1959), and this Court, 367 U. S. 1 (1961). Also affirmed were the underlying determinations, required by the Act, that the Party is directed or controlled by a foreign government or organization, that it operates primarily to advance the aims of the world Communist movement, and that it sufficiently satisfies the criteria of Communist-action organizations specified by 50 U. S. C. § 792 (e), including the finding by the Board that many Party members are subject to or recognize the discipline of the controlling foreign government or organization. This Court accepted the congressional appraisal that the Party posed a threat "not only to existing government in the United States, but to the United States as a sovereign, independent nation . . . ." 367 U. S., at 95.

Against this background protective measures were clearly appropriate. One of them, contained in 50 U. S. C. § 784 (a)(1)(D), which became activated with the affirmance of the Party's designation as a Communist-action organization, makes it unlawful "[f]or any member of such organization, with knowledge or notice . . . that such order has become final . . . to engage in any employment in any defense facility . . . ." A defense facility is any of the specified types of establishment "with respect to

the operation of which [the Secretary of Defense] finds and determines that the security of the United States requires" that members of such organizations not be employed. Given the characteristics of the Party, its foreign domination, its primary goal of government overthrow, the discipline which it exercises over its members, and its propensity for espionage and sabotage, the exclusion of members of the Party who know the Party is a Communist-action organization from certain defense plants is well within the powers of Congress.

Congress should be entitled to take suitable precautionary measures. Some Party members may be no threat at all, but many of them undoubtedly are, and it is exceedingly difficult to identify those in advance of the very events which Congress seeks to avoid. If Party members such as Robel may be barred from "sensitive positions," it is because they are potential threats to security. For the same reason they should be excludable from employment in defense plants which Congress and the Secretary of Defense consider of critical importance to the security of the country.

The statute does not prohibit membership in the Communist Party. Nor are appellee and other Communists excluded from all employment in the United States, or even from all defense plants. The touchstones for exclusion are the requirements of national security, and the facilities designated under this standard amount to only about one percent of all the industrial establishments in the United States.

It is this impact on associational rights, although specific and minimal, which the Court finds impermissible. But as the statute's dampening effect on associational rights is to be weighed against the asserted and obvious government interest in keeping members of Communist-action groups from defense facilities, it would seem important to identify what interest Robel has in

joining and remaining a member of a group whose primary goals he may not share. We are unenlightened, however, by the opinion of the Court or by the record in this case, as to the purposes which Robel and others like him may have in associating with the Party. The legal aims and programs of the Party are not identified or appraised nor are Robel's activities as a member of the Party. The Court is left with a vague and formless concept of associational rights and its own notions of what constitutes an unreasonable risk to defense facilities.

The Court says that mere membership in an association with knowledge that the association pursues unlawful aims cannot be the basis for criminal prosecution, *Scales* v. *United States,* 367 U. S. 203 (1961), or for denial of a passport, *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964). But denying the opportunity to be employed in some defense plants is a much smaller deterrent to the exercise of associational rights than denial of a passport or a criminal penalty attached solely to membership, and the Government's interest in keeping potential spies and saboteurs from defense plants is much greater than its interest in keeping disloyal Americans from traveling abroad or in committing all Party members to prison. The "delicate and difficult" judgment to which the Court refers should thus result in a different conclusion from that reached in the *Scales* and *Aptheker* cases.[2]

---

[2] I cannot agree with my Brother BRENNAN that Congress delegated improperly when it authorized the Secretary of Defense to determine "with respect to the operation of which [defense facilities] . . . the security of the United States requires the application of the provisions of subsection (a) of this section." Rather I think this is precisely the sort of application of a legislative determination to specific facts within the administrator's expertise that today's complex governmental structure requires and that this Court has

The Court's motives are worthy. It seeks the widest bounds for the exercise of individual liberty consistent with the security of the country. In so doing it arrogates to itself an independent judgment of the requirements of national security. These are matters about which judges should be wary. James Madison wrote:

"Security against foreign danger is one of the primitive objects of civil society. . . .

". . . The means of security can only be regulated by the means and the danger of attack. They will in fact be ever determined by these rules, and by no others. It is in vain to oppose constitutional barriers to the impulse of self-preservation. It is worse than in vain; because it plants in the Constitution itself necessary usurpations of power, every precedent of which is a germ of unnecessary and multiplied repetitions." [3]

---

frequently upheld. *E. g., Yakus* v. *United States,* 321 U. S. 414 (1944). I would reject also appellee's contention that the statute is a bill of attainder. See *United States* v. *Brown,* 381 U. S. 437, 462 (1965) (WHITE, J., dissenting).

[3] The Federalist No. 41, pp. 269–270 (Cooke ed. 1961).