Agosti, J.,
with whom Shearing and Rose, JJ., agree,
dissenting:
As the majority aptly states, the right to wander freely and anonymously, if we so choose, is a fundamental right of privacy in a democratic society. However, the majority promptly abandons this fundamental right by requiring “suspicious” citizens to identify themselves to law enforcement officers upon request, or face the prospect of arrest. I dissent from the majority’s holding that the identification portion of NRS 171.123 is constitutional.
It is well-established that police officers may stop a person when reasonable suspicion exists that that person is engaged in illegal activity.[1] However, it is equally well-established that detaining a person and requiring him to identify himself constitutes “a seizure of his person subject to the requirements of the Fourth Amendment.”[2] In light of these constitutional requirements, the United States Supreme Court has stated that although the officers may question the person, the detainee need not answer any questions.[3] Furthermore, unless the detainee volunteers answers and those answers supply the officer with probable cause to arrest, the detainee must be released.[4]
The Fourth Amendment requires that governmental searches and seizures be reasonable. Reasonableness is determined by “a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.”[5] A court’s primary concern in weighing these interests is to assure ‘ ‘that an individual’s reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers.”[6]
Anonymity is encompassed within the expectation of privacy, a civil liberty that is protected during a Terry stop. The majority now carves away at that individual liberty by saying that a detainee must surrender his or her identity to the police.
I agree with the Ninth Circuit Court of Appeals’ reasoning on the issue of whether a person may be arrested for refusing to identify himself during a Terry stop.[7] In Martinelli v. City of *878 Beaumont,[8] a woman was arrested for delaying a lawful police investigation by refusing to identify herself during a Terry investigation.[9] The court held that allowing the police officers to arrest the woman for failing to identify herself in effect allowed the officers to ‘ ‘ ‘bootstrap the authority to arrest on less than probable cause.’ ”[10] The court determined that the woman’s interest in her personal security outweighed the “ ‘mere possibility that identification may provide a link leading to arrest.’ ”[11]
More directly on point, the Ninth Circuit in Carey v. Nevada Gaming Control Board[12] addressed the constitutionality of NRS 171.123(3), the very statute at issue here. In Carey, a casino patron brought a claim under 42 U.S.C. § 1983 against a Nevada Gaming Control Board agent for violating his Fourth, Fifth and Fourteenth Amendment rights.[13] The agent was called to a hotel to investigate Carey and another man, who were both suspected by hotel employees of cheating.[14] The agent caused the men to be detained, identified himself, indicated he was investigating gaming law violations, read them their Miranda rights and conducted a pat-down search of both detainees.[15] During the Terry investigation, the agent determined there was no probable cause to arrest the men for gaming violations.[16] However, when the agent asked the men to identify themselves, Carey refused, and he was arrested pursuant to NRS 171.123(3) and NRS 197.190.[17] On appeal, the Ninth Circuit noted that the agent had reasonable suspicion to conduct a Terry stop, and also probable cause to arrest Carey under NRS 171.123(3) and NRS 197.190 once Carey refused to identify himself. However, the court concluded that NRS 171.123(3) and NRS 197.190, as applied to Carey, violated the Fourth Amendment because the United States Supreme Court “has consistently recognized that a person detained pursuant to Terry “‘is not obliged to answer”’” questions posed by law enforcement officers.[18] The court determined that Carey’s interest in his personal security outweighed any potential link leading to *879 arrest that could be gleaned from his identity, particularly because Carey’s name “was not relevant to determining whether Carey had cheated.”[19]
Despite the above authority, the majority erroneously affirms Hiibel’s conviction by reflexively reasoning that the public interest in police and public safety outweighs Hiibel’s interest in refusing to identify himself. I am not persuaded. And I am uneasy about the reasons given by the majority in justifying its holding.
The majority concludes that the governmental interest in police safety outweighs an individual’s interest in his right to keep private his identity. The majority relies upon FBI statistics about police fatalities and assaults to support its argument. However, it does not provide any evidence that an officer, by knowing a person’s identity, is better protected from potential violence. In Terry, the United States Supreme Court addressed the issue of officer safety by carving out an exception to the Fourth Amendment to allow a police officer to make certain that the person being detained “is not armed with a weapon that could unexpectedly and fatally be used against him”[20] when the officer reasonably believes “he is dealing with an armed and dangerous individual.”[21] The purpose of such a search is to ensure the detainee is not armed with a weapon that could be immediately used against a police officer, not to ensure against a detainee’s propensity for violence based upon a prior record of criminal behavior.
It is well known that within the context of a Terry stop an officer’s authority to search is limited to a pat-down to detect weapons. The officer may investigate a hard object because it might be a gun. An officer may not investigate a soft object he detects, even though it might be drugs. Similarly, an officer may not detect a wallet and remove it for search. With today’s majority decision, the officer can now, figuratively, reach in, grab the wallet and pull out the detainee’s identification. So much for our right to be left alone or as the majority says — to wander freely and anonymously if we choose.
The majority avoids the fact that knowing a suspect’s identity does not alleviate any threat of immediate danger by arguing that a reasonable person cannot expect to withhold his identity from police officers, as we reveal our names to different people every day. What the majority fails to recognize, however, is that when we give our names to new acquaintances, business associates and shop owners, we do so voluntarily, out of friendship or to complete a transaction. With the heightened security at airports, for example, passengers are required to provide picture identification. But non-passengers are free to wander that portion of the airport *880 that is unsecured without showing an ID. Purchasing an airline ticket is a business transaction, and the airlines may condition the sale on knowing who is the purchaser. In contrast, being forced to identify oneself to a police officer or else face arrest is government coercion — precisely the type of governmental intrusion that the Fourth Amendment was designed to prevent. Furthermore, it is not necessary to have one’s name on a credit card or checkbook in order to effect a purchase. A dedicated libertarian, for example, might deliberately eschew financial institutions, credit cards and checkbooks, engaging solely in cash transactions, in order to jealously protect his individual rights, especially his right to be anonymous, to be left alone, to wander freely.
Finally, the majority also makes an emotional appeal based upon fear and speculation by arguing that the police would be powerless to protect innocent children from sex offenders, to enforce restraining .orders, and to enforce curfews for minors. What the majority fails to recognize is that it is the observable conduct, not the identity, of a person, upon which an officer must legally rely when investigating crimes and enforcing the law.
The majority further appeals to the public’s fear during this time of war “against an enemy who operates with a concealed identity.” Now is precisely the time when our duty to vigilantly guard the rights enumerated in the Constitution becomes most important. To ease our guard now, in the wake of fear of unknown perpetrators who may still seek to harm the United States and its people, would sound the call of retreat and begin the erosion of civil liberties. The court must not be blinded by fear. I am reminded of a statement by Justice Felix Frankfurter, so aptly quoted by Chief Justice Young, the majority’s author, in another search and seizure case involving individual liberties protected by the Fourth Amendment:
“[W]e are in danger of forgetting that the Bill of Rights reflects experience with police excesses. It is not only under Nazi rule that police excesses are inimical to freedom. It is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end.”[22]
The majority, by its decision today, has allowed the first layer of our civil liberties to be whittled away. The holding weakens the democratic principles upon which this great nation was founded. *881 The undermining of that foundation is a harm more devastating to our country and to this State than any physical harm a terrorist could possibly inflict. “It would indeed be ironic if, in the name of national defense, we would sanction the subversion of . . . liberties . . . which make[ ] the defense of the Nation worthwhile.’ ’[23] Our nation is besieged. The terrorist threat has shaken our complacency. Our way of life is threatened as never before. At this time, this extraordinary time, the true test of our national courage is not our necessary and steadfast resolve to defend ourselves against terrorist activity. The true test is our necessary and steadfast resolve to protect and safeguard the rights and principles upon which our nation was founded, our constitution and our personal liberties. I dissent from the majority’s retreat from this challenge.

 Terry v. Ohio, 392 U.S. 1, 21-22 (1968); see also State v. Lisenbee, 116 Nev. 1124, 1127, 13 P.3d 947, 949 (2000).

 Brown v. Texas, 443 U.S. 47, 50 (1979).

 Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

 Id. at 439-40; see Kolender v. Lawson, 461 U.S. 352, 360 n.9 (1983).

 Brown, 443 U.S. at 50-51.

 Id. at 51.

Although the United States Supreme Court has not yet addressed this issue and there is a split of federal authority, I find the Ninth Circuit’s approach to be the more lucid one.

 820 F.2d 1491 (9th Cir. 1987).

 Id. at 1492.

 Id. at 1494 (quoting Lawson v. Kolender, 658 F.2d 1362, 1366 (9th Cir. 1981), aff’d, 461 U.S. 352 (1983)).

 Id. (quoting Lawson, 658 F.2d at 1366-67).

 279 F.3d 873 (9th Cir. 2002).

 Id. at 876.

 Id.

 Id.

 Id.

 Id. at 876, 879-80.

Id. at 881-82 (quoting Dunaway v. New York, 442 U.S. 200, 211 n.12 (1979) (quoting Terry v. Ohio, 392 U.S. 1, 34 (1968))).

 Id. at 880.

 Terry, 392 U.S. at 23.

 Id. at 27.

United States v. Robel, 389 U.S. 258, 264 (1967).

Barrios-Lomeli v. State, 114 Nev. 779, 782, 961 P.2d 750, 752 (1998) (quoting Davis v. United States, 328 U.S. 582, 597 (1946) (Frankfurter, J., dissenting)).