Margaret J. RANDALL, et al.,
Appellants,

v.

Edwin MEESE, III, Attorney
General, et al.

No. 87–5230.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 4, 1988.

Decided Aug. 16, 1988.

David Cole, with whom Michael Ratner, Walter J. Rockler, Cynthia M. Lewin and Michael Maggio, Washington, D.C., were on the brief for appellants.

Michael L. Martinez, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty.,* John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees. Michael J. Ryan and Royce C. Lamberth,* Asst. U.S. Attys., Washington, D.C., also entered appearances for appellees.

Ann H. Franke, Washington, D.C., was on the brief for amicus curiae American Ass'n of University Professors, et al. urging reversal.

Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

Dissenting opinion filed by Circuit Judge MIKVA.

RUTH BADER GINSBURG, Circuit Judge:

Plaintiff-appellant Margaret J. Randall is a noted writer and photographer; born in New York in 1936 and raised in this country, she lost her United States citizenship in 1966 when she declared her allegiance to Mexico. Her parents are citizens of the United States residing, since 1947, in Albuquerque, New Mexico; her four children are also United States citizens. Randall seeks an adjustment of her immigration status to that of a permanent resident so that she may again become a United States

* At time brief was filed.

citizen. She has so far been denied that relief by the Immigration and Naturalization Service (INS or Immigration Service). We hold that her resort to court is premature, and we therefore affirm the district court's judgment dismissing her complaint. The dismissal, we emphasize, is without prejudice to eventual renewal of Randall's claims, in a proper circuit, including her contention that her status should be adjusted as of October 2, 1985, the date the district director denied her application.

## I. INTRODUCTION

Margaret Randall's pleas for authorization to remain in the United States permanently commenced in 1984; Immigration (McCarran–Walter) Act[1] prescriptions then in effect authorized the executive branch, if specified terms are met, to exclude aliens on ideological grounds. *See* 8 U.S.C. § 1182(a)(28) (1982) (rendering excludable aliens who believe in communism or anarchism, write about those doctrines, or belong to an organization that promotes those doctrines); *see generally* Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents*, 100 HARV.L.REV. 930 (1987). The law of the United States, as ordered by Congress for 1988, has changed. It is now impermissible to deny a visa or an application for permanent resident status "because of any past, current, or expected beliefs, statements, or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution." For-

eign Relations Authorization Act, PUB. L.No. 100–204, § 901(a), 101 Stat. 1399, 1399–1400 (1987).[2]

Randall's case is thus set in a time of transition. The government once opposed her application for permanent residency on the ground that her writings advocated the doctrines of world communism and therefore made her excludable under section 1182(a)(28). That ground is not currently available to the executive. *See Allende v. Shultz*, 845 F.2d 1111, 1121 (1st Cir.1988). It therefore appears that the large question initially raised—*whether* Margaret Randall could regain United States citizenship—is now reduced to the question—*when* can she regain it.[3]

To render comprehensible the conundrum this appeal presents, we first describe the statutory and regulatory complex relevant to status adjustment applications, and then set out the significant facts and procedural history in Randall's case.

## II. THE ADJUSTMENT OF STATUS REGIME

Before 1935, neither statute nor administrative practice permitted adjustment of the status of an alien already in the United States; to achieve reclassification from nonimmigrant to permanent resident status, the alien had to leave the country and, in the ordinary course, apply to a United States consular officer abroad for an immigrant visa. *See* 8 U.S.C. § 202(a) (1934); *Centeno v. Shultz*, 817 F.2d 1212, 1214 (5th

---

**1.** Immigration and Nationality Act, PUB.L.No. 414, 66 Stat. 163 (1952) (current version at 8 U.S.C. § 1101 (1982)).

**2.** The proscriptions of section 901(a) are temporary; they apply only to

(1) applications for visas submitted during 1988;

(2) admissions sought after December 31, 1987, and before March 1, 1989; and

(3) deportations based on activities occurring during 1988 or for which deportation proceedings (including judicial review with respect to such a proceeding) are pending at any time during 1988.

Foreign Relations Authorization Act, PUB.L.No. 100–204, § 901(d), 101 Stat. 1400.

A pending bill, H.R. 4427, 100th Cong., 2d Sess., 134 CONG.REC. H2171 (daily ed. Apr. 20,

1988), would render the proscriptions of section 901(a) a permanent part of the Immigration and Nationality Act through comprehensive amendment of the grounds for excluding and deporting aliens.

**3.** At oral argument, Michael L. Martinez, representing the government, said:

[W]e believe[ ] ... based on section 901 of the new law that Congress ha[s] repealed the application of sections [1182(a) (28) ] (G) and [ (G) ] (v) ... to persons whose deportation proceedings were pending during 1988 and ... we believe that that on its face applies to Mrs. [sic] Randall's case.... The INS has decided within the context of the [Board of Immigration Appeals] that they [sic] will not oppose application of 901 to [Randall] in [deportation] proceedings.

Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988) (adhering to position that "decisions of United States consuls on visa matters are nonreviewable by the courts").

To reduce the hardship and inconvenience of this "depart and seek reentry" procedure, the Immigration Service devised a "pre-examination plan" which made accessible to some aliens a less expensive process: after screening by immigration officials here, the alien could travel briefly to Canada and there acquire from a United States consular officer the sought-after immigrant visa. *See* S.REP. 1515, 81st Cong., 2d Sess. 603 (1950); 8 C.F.R. § 142 (Supp. 1941). If the alien, once in Canada, failed to pass the consular officer's checks, he would be sent back to the United States, pursuant to an agreement with Canada; promptly upon his return, deportation proceedings would be instituted against him. *See* 8 C.F.R. § 142.18 (Supp.1941). The alien would have no opportunity, in those proceedings, to gain a status adjustment.

In 1952, in the new Immigration and Nationality Act, Congress itself addressed the matter. Section 245 of the Act, codified at 8 U.S.C. § 1255, enabled an alien, under specified conditions, to obtain an immigrant visa "without the necessity of leaving the United States." *See* H.R.REP. 2096, 82d Cong., 2d Sess. 128 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653. The prescription currently in force permits

> [t]he status of an alien who was inspected and admitted or paroled into the United States [to] be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a); *see Jain v. INS,* 612 F.2d 683, 687 (2d Cir.1979) ("adjustment of status under 245" is "extraordinary relief,"

therefore burden is on alien to persuade Immigration Service "to exercise its discretion favorably"), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980); *see also* T. ALEINIKOFF & D. MARTIN, IMMIGRATION PROCESS AND POLICY 282–83, 288–92 (1985).

By thus authorizing the Attorney General (and, under his delegation, Immigration Service officers) to grant permanent resident status, Congress afforded aliens present in this country on nonimmigrant visas a marked advantage over the alien who could receive an immigrant visa only from a consular officer abroad. The alien in the United States, through the regulations implementing the congressional prescription, now has dual opportunities to seek permanent resident status. First, he may apply for relief to "the district director having jurisdiction over his place of residence." 8 C.F.R. § 245.2(a)(1). Should the alien fail to gain adjustment at this stage, he is entitled to a de novo review of his application in the context of deportation proceedings. *See* 8 C.F.R. §§ 242.17(a), 245.2(a)(5)(ii).

Proceedings before the district director may be summary. Service instructions state:

> Unless a case involves complex questions of fact or law, the adjudicator shall complete an interview of an individual or family group within a period of 15–30 minutes. In no event may an interview exceed 30 minutes without the authority of a supervisory immigration examiner.

INS Operating Instructions 245.36, *reprinted in* 4 C. GORDON & H. ROSENFELD, IMMIGRATION LAW AND PROCEDURE at 25–251 (1987). Reflecting the abbreviated course this first process may take, and the prospect of a second, closer look, the regulations preclude a direct administrative appeal from a district director's denial of a status adjustment application. 8 C.F.R. § 245.2(a)(5)(ii).

Unlike the alien of an earlier day whose sole recourse was to a consular officer abroad, however, the alien in the United States seeking status adjustment today may obtain full consideration of his applica-

tion in deportation proceedings. *See* 8 C.F. R. §§ 242.17(a), 245.2(a)(5)(ii); *see also Jain v. INS*, 612 F.2d at 689 (finding "without merit" argument that alien seeking status adjustment "was denied due process because he was unable to appeal [district director's] denial of his . . . application directly and could only do so in the context of deportation proceedings"). At this stage, the alien is accorded a plenary hearing; he has the right to be represented by counsel, to introduce evidence, and to cross-examine. 8 U.S.C. § 1252(b); 8 C.F.R. § 242.16. If the immigration judge rules against the alien, he may appeal to the Board of Immigration Appeals, 8 C.F.R. §§ 236.7, 242.21, and thereafter, by prescription of the Act itself, to a court of appeals. 8 U.S.C. § 1105a(a). Of prime significance to our resolution of this appeal, the statute sets the venue of a judicial review petition in "the judicial circuit in which the administrative proceedings before a special inquiry officer were conducted . . . or in the judicial circuit wherein is the residence . . . of the petitioner, but not in more than one circuit[.]" 8 U.S.C. § 1105a(a)(2).

### III. FACTS AND PROCEDURAL BACKGROUND

Appellant Randall left the United States in 1961 and continued to reside abroad until 1984. She lived first in Mexico and became a citizen of that country; in 1969 she moved to Cuba and in 1980, to Nicaragua. During the years she resided and traveled outside the United States, she experienced and wrote about social change and revolution in third world nations. Randall studied particularly the position and problems of women in those countries. Returning to the United States on a visitor's visa in January 1984, she filed an application for permanent resident status two months later. Randall has been living, since her return, in Albuquerque, New Mexico; her residence there is close to that of her now elderly parents. She gained employment as a professor at the University of New Mexico, serving in the Department of American Studies and the Women's Studies program.

It is undisputed that Randall meets the first and third of the three conditions enumerated in 8 U.S.C. § 1255(a) for adjustment of status to that of an alien lawfully admitted for permanent residence: (1) she was inspected and admitted or paroled into the United States and has made an application for status adjustment; (3) an immigrant visa is immediately available to her based on the petition of her United States citizen son, Gregory Jason Randall. *See* 8 U.S.C. § 1255(a)(1), (3).[4] We turn now to the administrative proceedings Margaret Randall has thus far encountered—the first before an INS district director, the second in a deportation setting—and the treatment in those proceedings of the central criterion, numbered (2) in the section 1255(a) listing: Randall's eligibility to receive an immigrant visa as an alien "admissible to the United States for permanent residence." 8 U.S.C. § 1255(a)(2).

### A. *The District Director's October 2, 1985 Decision*

The Immigration Act, we pause to note, sets out thirty-three classes of aliens "ineligible to receive visas"; persons falling within those classes (or subclasses) are, in the Act's words, "excluded from admission into the United States." 8 U.S.C. § 1182(a). The INS district director in El Paso, functioning as the Attorney General's delegate, *see* 8 C.F.R. § 245.2, ruled in October 1985 on Randall's March 1984 status adjustment application. Looking to section 1182(a), the district director identified as the focus of his attention only one "excluded from admission" category:

Aliens who write or publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, publication, distribution, or display, any

---

**4.** A citizen may file a petition for adjustment of the immigration status of his "immediate relative." Under the Immigration Act's definition, 8 U.S.C. § 1151(b), only "children, spouses, and parents of a citizen of the United States" can qualify for "immediate relative" status.

written or printed matter, advocating or teaching ... (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship[.]

8 U.S.C. § 1182(a)(28)(G)(v).[5]

The district director reported that five of Margaret Randall's books had been examined in light of subsection 1182(a)(28)(G)(v). That examination, the district director endeavored to show through illustrative quotations, revealed Randall's exuberant praise of Fidel Castro and the Cuban Revolution, her applause for the "Vietnamese victory," and her condemnation of the United States. Summing up, the district director stated that, although Randall had denied membership in the Communist Party,

[b]y her own admission, [she] has made speeches for The [sic] Communist Party. Her books advocate the doctrines of communism and support the Communist governments of Cuba, Vietnam and Nicaragua from 1966 to 1981.

However, the district director did not then return to his starting line. He did not restate, and this time answer, the question whether, within the meaning of 8 U.S.C. § 1182(a)(28)(G)(v), Randall had published writings advocating "the economic, international, and governmental doctrines of world communism." Instead, he said:

Benefits under [8 U.S.C. § 1255] are discretionary. There are numerous decisions relating to the discretionary authority of the Attorney General in the adjudication of applications for adjustment of status. [Citations to string of adminis-

trative decisions omitted.] All of these decisions, with others, point out that even though the applicant appears to be statutorily eligible for the benefits under [§ 1255], the grant of an application is a matter of discretion and administrative grace.

The district director denied Randall's application with this concluding comment:

The record of the applicant is self-evident. She has failed to show that she is clearly and beyond a reasonable doubt entitled to the benefits for which she has applied. Her activities and writings for nearly the past 20 years speak for themselves. Her writings go far beyond mere dissent, disagreement with, or criticism of the United States or its policies. Her associations with, and her activities and writings in support of the communist dominated governments of Cuba, North Vietnam, and Nicaragua; and her advocacy and support of revolutionary activity in Mexico, as well as her affiliation with and participation in Communist Party activities, warrant the denial of her application for adjustment of status as a matter of discretion.

The director granted Randall the privilege of departing voluntarily from the United States by October 30, 1985.[6]

### B. The Immigration Judge's August 28, 1986 Decision

On November 7, 1985, one week after Randall's time to depart voluntarily had expired, the Immigration Service issued an order to show cause why she should not be deported. See 8 C.F.R. § 242.1. As part

---

**5.** Although the District Director set out only subsection 1182(a)(28)(G), the tenor of his decision suggests that he also had in mind another "excluded from admission" category:

Aliens who are members or affiliated with (i) the Communist Party of the United States, (ii) any other totalitarian party of the United States, (iii) the Communist Political Association, (iv) the Communist or any other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state, (v) any section, subsidiary, branch, affiliate, or subdivision of any such association or party, or (vi) the direct predecessors or succes-

sors of any such association or party, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt[.]

8 U.S.C. § 1182(a)(28)(C).

**6.** A deportable alien may be accorded permission to depart voluntarily. 8 U.S.C. § 1252(b). In addition to avoiding the stigma of compulsory expulsion, an alien granted this privilege is not subject to the felony prosecution that deported aliens face who return without permission within five years of their deportation. See 8 U.S.C. § 1326. An alien who voluntarily departs may also choose his destination.

of her response to this INS initiative, Randall again sought adjustment of her status.

The immigration judge presiding at the deportation hearing surveyed Randall's activities abroad, and particularly her writings. Like the district director, the immigration judge pointed up Randall's "praise for the communist North Vietnamese victory," and her constant "support of the Castro communist revolution." Based on a "full[ ] reading ... [of Randall's] literature,"[7] the immigration judge concluded in his August 1986 decision that "portions of [her] various writings advocate the economic, international, and governmental doctrines of world communism"; hence, he determined, subsection 1182(a)(28)(G)(v) (set out *supra* pp. 475–76) placed her in an "excluded from admission" category,[8] and that placement rendered her ineligible for a status adjustment.

In contrast to the district director, however, the immigration judge squarely addressed and sharply distinguished the question whether Randall was statutorily eligible to receive a visa from the question whether it would be appropriate to exercise discretion in her favor. As to the latter, the immigration judge observed:

> [A]ccording evidentiary weight to [Randall's] non-proscribed political opinions would result in the political opinion of the adjudicating officer being the determinative factor. Clearly the favorable or unfavorable exercise of discretion cannot and must not be based upon the personal political opinion of the adjudicating officer. Accordingly [Randall's] non-proscribed written political opinions ... must be accorded neutral evidentiary weight as they relate to the issue of discretion.

He then stated that in view of the United States citizenship of Randall's parents and children, her ownership of a home in the United States, and the significant value of her service to the academic community, "the favorable exercise of discretion would be warranted in [her] case were she eligible to receive an immigrant visa and admissible to the United States for permanent residence." Randall promptly appealed the immigration judge's decision that she was statutorily ineligible to receive a visa to the Board of Immigration Appeals; the Board heard oral argument on October 20, 1987, and the matter remains *sub judice* there.

## C. Proceeding in the District Court

On October 28, 1985, two days before expiration of the time the district director had allowed for Randall's voluntary departure, and ten days before the Immigration Service ordered Randall to show cause why she should not be deported, Randall commenced the instant action challenging the district director's October 2, 1985 denial of her status adjustment application.[9] Randall asserted that the district director acted without statutory authority, and in violation of her first and fifth amendment rights, in rejecting her adjustment application, as a matter of "discretion," because of the ideas and opinions she had expressed. She sought declaratory and injunctive relief, including "[a] declaration that 8 U.S.C. §§ 1182(a)(28)(G) and (C) are unconstitutional," and an instruction to the district director to grant her application, or to reconsider it within appropriate constitutional and statutory limits.

The district judge, confronting Randall's motion for immediate injunctive relief and an opposing motion by defendants to dismiss the case, and aware of the ongoing deportation proceedings, made no definitive ruling until the immigration judge had completed his consideration of Randall's status adjustment plea. Eventually, in an opinion and order filed June 5, 1987, the district judge granted the defendants' motion to

---

7. The immigration judge reported that the reading and study encompassed "in their entirety" 2,744 pages of Randall's writings.

8. The immigration judge specifically ruled, however, that the evidence did not suffice to place Randall in any "excludable alien" category other than subsection 1182(a)(28)(G)(v). *Cf. supra* note 5.

9. Several prominent authors, a world association of writers, two academic colleagues, and a student enrolled in Margaret Randall's courses joined Randall as named plaintiffs.

dismiss the case, making it plain that he did so exclusively on "the unique facts" presented. *Randall v. Meese*, No. 85–3415 (D.D.C. June 5, 1987) [available on WEST-LAW, 1987 WL 12570].

The district court's opinion reflects the intricacy of the law in point [10] and makes these principal observations: alleged abuses by a district director ancillary or preliminary to deportation proceedings may be reviewable in district court; the Supreme Court, in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), upheld the constitutionality of exclusions under 8 U.S.C. § 1182(a)(28) based on an individual's political beliefs; Congress, as the immigration judge had indicated, probably did not intend that *discretionary* rulings could rest solely on an individual's non-proscribed political opinions; deportation proceedings afford the alien an opportunity for de novo, plenary consideration of her application for adjustment of status; the deportation process now in motion secures for Randall the fair consideration she warrants; no credit is due the district director's ruling in those proceedings; although the district director's denial of Randall's application is not itself subject to administrative review, the director's decision, to the extent it entailed an exercise of "discretion," has been effectively overtaken by the immigration judge's decision in the ongoing deportation proceeding.

The district judge did not label his dismissal order. Randall describes it as a mootness ruling and assails it on that basis. For the reasons we next state, we compre-hend the dismissal order differently. The district judge has left Randall's substantive pleas untouched, it is true, but still open for judicial review at a later time—when a final order has been made by the Board of Immigration Appeals—and in another place —in the judicial circuit in which the El Paso district director and immigration judge proceeded, or the judicial circuit in which Randall resides. *See* 8 U.S.C. § 1105a(a)(2) (restricting venue choice for review of final orders in deportation proceedings, quoted *supra* p. 475). So comprehended, the district court's ruling means that Randall has asked for judicial intervention not too late but too soon, *i.e.*, that her Complaint's essential prayers for relief—declarations that defendants (Attorney General, Commissioner of the INS, District Director) have arbitrarily refused to adjust her status and that 8 U.S.C. §§ 1182(a)(28)(G) and (C) are unconstitutional—demand answers to questions not ripe for court review on the basis of the district director's inconclusive disposition.[11]

## IV. ANALYSIS

Randall's insistence that judicial review is in order *here, i.e.*, in the District of Columbia federal courts rather than in the judicial circuit where administrative proceedings were initiated (Fifth Circuit) or in which she resides (Tenth Circuit) (*see* 8 U.S.C. § 1105a(a)(2)), and *now* (in advance of termination of the deportation proceedings), depends entirely on an ingenious, but incorrect characterization of the district di-

---

**10.** *Cf. Sang Seup Shin v. Immigration and Naturalization Service*, 750 F.2d 122, 125 n. 5 (D.C. Cir.1984) (expressing court's "discomfort with the nation's convoluted immigration laws and their uncertain, inefficient, or protracted administration").

**11.** The Prayer for Relief presented in Randall's Complaint, in its entirety, invites:

a) A declaration that defendants' refusal to grant Randall's adjustment of status violates the First and Fifth Amendments, and is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of 5 U.S.C. § 706;

b) A declaration that 8 U.S.C. §§ 1182(a)(28)(G) and (C) are unconstitutional;

c) An injunction directing defendants to reconsider Margaret Randall's application for adjustment of status to permanent resident alien, and prohibiting defendants from continuing to exercise their discretion in a manner that is inconsistent with the terms and intent of the Immigration and Nationality Act and that violates the guarantees of the First and Fifth Amendments; or in the alternative, ordering defendants to grant Randall permanent resident status.

d) Such other and further relief as this Court deems just and proper; and

e) The costs and attorneys' fees incurred in this action.

Complaint, *Randall v. Meese*, D.D.C. No. 85–3415.

rector's action. She maintains, with increasing certitude, that the district director *first found her statutorily eligible* for adjustment of status, and only then rejected her application in an abusive, unauthorized, unconstitutional exercise of discretion. Had the district director followed up the hypothesized finding that she was statutorily eligible for adjustment of status with a properly constrained exercise of discretion, Randall's argument continues, he would have granted her application, there would have been no deportation to fight, she would be a permanent resident, perhaps even by now a citizen.[12]

Were Randall correct that the district director did indeed definitively find that "she was *not* excludable under either 8 U.S.C. § 1182(a)(28)(C), which bars aliens who have been members of the Communist Party, or 8 U.S.C. § 1182(a)(28)(G), which excludes aliens who write, publish, or circulate matter advocating or teaching the 'economic, international, and governmental doctrines of world communism'," Brief for Appellants at 9 (emphasis in original), the rest of her argument would have more force. Were her first premise right, we would still face the unsettled question whether the district director's decision is amenable to direct judicial review. *Compare Kashani v. Nelson*, 793 F.2d 818 (7th Cir.1986) (suggesting, in the context of an asylum application, that such review would constitute an impermissible end-run around the deportation process) *with Jaa v. United States INS*, 779 F.2d 569 (2d Cir.1986) (upholding on direct review district director's denial of status adjustment). But assuming arguendo a resolution of that threshold issue in Randall's favor, the question of central concern to us would be whether the district director tolerably exercised his discretion. If we answered that question by conclud-

ing, in line with the analysis of the immigration judge, *see supra* pp. 476–77, that the director improperly calculated the discretionary balance, Randall's plea for a remand with instructions to grant her status adjustment application would be legitimate.

■ But we cannot accept Randall's first premise. We do not agree that the district director found her statutorily eligible, we cannot pretend that he proceeded in the logical order and with the conscious design Randall attributes to him, *i.e.*, first firmly resolving that she was *not* excludable under 8 U.S.C. § 1182(a)(28)(G) or (C), and only then deciding that he nonetheless had power to, and should exercise his discretion against her. The Supreme Court, correcting the error of our sister court, has made this much plain: district directors denying adjustment of status need not rule on eligibility first; they may instead pretermit that issue and go at once to the matter of discretion. *See Immigration and Naturalization Service v. Bagamasbad*, 429 U.S. 24, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976), *reversing* 531 F.2d 111 (3d Cir.). We think it imaginative, but implausible, to contend that the director here took any route other than the easy one declared open to him by the Supreme Court, *i.e.*, he pretermitted the subsections 1182(a)(28)(G) and (C) questions, skipping from them to the matter of his discretion.

As the district court observed, while the district director *referred* to the excludable alien categories of section 1182(a)(28), he based the denial of Randall's application on his discretion, and it surely is not clear, as Randall lately argues it is, that he effectively *decided* that Randall was statutorily eligible.[13] "Statutory eligibility," the dis-

---

**12.** Under 8 U.S.C. § 1430(a), an alien can apply for naturalization three years after becoming a lawful resident.

**13.** Randall's position on what the district director decided has lost no flesh in the retelling. Her Complaint asserted, simply and accurately, that the director "did not ... find her excludable on [subsection 1182(a)(28)(G) or (C)] grounds." Complaint para. 25. That assertion is entirely consistent with the view that, as the

Supreme Court held proper in *Bagamasbad,* the director bypassed the section 1182(a)(28) inquiry. But by the time the case was aired in the district court, Randall's initial "did not find her excludable" averment became "found her admissible." *See Randall v. Meese,* No. 87–5230, Transcript of Proceeding, Feb. 24, 1987, at 91 ("[district director has] found her statutorily eligible"), 92 ("[district director] has already, in fact, found her to be statutorily eligible").

trict judge pointed out citing *Bagamasbad*, "need not be decided if an adjustment of status is denied for discretionary reasons." *Randall v. Meese*, No. 85–3415, slip op. at 14 n. 8.

Randall's now insistent claim that the district director definitively found her to be statutorily eligible rests on a single phrase in the director's decision, cut loose from its context: "even though the applicant appears to be statutorily eligible ..., the grant of an application is a matter of discretion...." We have set out *supra* p. 476 the relevant surrounding text of the director's decision, and in an appendix hereto, the full text of that decision. The director mentioned the statute first, the 8 U.S.C. § 1255(a) specification that the Attorney General, "in his discretion" may adjust the status of an alien. He next cited INS decisions in point. He then stated that the cited decisions, "with others, point out that even though the applicant appears to be statutorily eligible," there is a discretionary determination to be made. We think the most likely reading of the director's full statement is that he intended the words "the applicant" to refer to applicants in general, not applicant Randall in particular. In any event, he certainly did not make any conclusive pronouncement that Randall cleared the subsections 1182(a)(28)(G) and (C) hurdles, for he used the qualifying words "appears to be" in his statement. Finally, we note, it is plausible

to suggest that the director had in mind not Randall's clearing of the section 1182(a)(28) excludable alien hurdles, but her satisfaction of the requirement that a visa be available to her based on the petition of a close relative—her citizen son. *See supra* p. 475.[14]

■ In sum, Randall's plea—for an instruction from the district judge simply ordering the district director to grant her application or to do over only "the discretionary component of [his] adjustment decision," Brief for Appellants at 21—is inadmissible.[15] However infected that exercise of discretion was, the district director, were he to be restored *nunc pro tunc* to a decisionmaking position, could not adjust Randall's status without answering the question he did not decide definitively, if at all: as of October 2, 1985, the date he denied Randall's application, was she statutorily eligible to receive an immigrant visa as an alien "admissible to the United States for permanent residence." 8 U.S.C. § 1255(a)(2). *See supra* p. 476.

■ A remand to the district director at this stage, we further note, would be out of sync with the prescription that "[a]fter an alien has been served with an order to show cause ..., his application for adjustment of status ... shall be considered only in [the deportation] proceedings." 8 C.F.R. § 245.2(a)(1). There is the further compli-

---

**14.** In her brief, Randall attempted to cordon off from our view the immigration judge's finding that she was statutorily *ineligible* for adjustment by observing that "defendants [themselves] concede that the district director has already found Ms. Randall statutorily *eligible* for adjustment of status." Brief for Appellants at 21 (emphasis in original). But defendants made no such concession. True, the Assistant U.S. Attorney did say to the district court, "she was determined to be eligible...." But the Assistant's full statement was: "she was determined to be eligible, because she married an American citizen." Transcript of Proceeding, Feb. 24, 1987, at 70. This statement plainly referred to the third, not the second, § 1255(a) specification—the availability of a visa based on the petition of a U.S. citizen close relative. *See supra* note 4. As the immigration judge recounted, both Randall's U.S. citizen spouse, and her U.S. citizen son petitioned for an immediate relative visa on Randall's behalf. That judge considered the son's petition

the necessary and sufficient one, in view of "certain marital difficulties." Decision of the Immigration Judge, In re Margaret Jo Randall, A 11 644 708 slip op. at 11 (Aug. 28, 1986).

**15.** There is an irony in Randall's plea that absent court intervention now, the district director's decision will escape judicial correction, for the review she invites is one-sided. Were we to direct a remand of the limited scope she urges, we would cut off the opportunity for the INS to maintain and argue in court that section 1182(a)(28) applied to Randall (until 1988, when section 901 of the Foreign Relations Authorization Act became effective, *see supra* note 2 and accompanying text) and is constitutional as so applied. Individuals are entitled to a fair opportunity to be heard before adverse action is taken against them. But government too should have a fair chance to assert and defend in court the propriety of the executive's application of a legislative measure.

cation that the immigration judge's decision now extant concludes that Randall fits the subsection 1182(a)(28)(G)(v) excludable alien category, so that at the time of his disposition, she was not statutorily eligible for adjustment.

Moreover, in the ongoing deportation proceedings, the recent change in the law governs. Under the Foreign Relations Authorization Act, PUB.L.NO. 100–204, § 901, 101 Stat. 1399–1400, *see supra* p. 473, in contradiction of subsection 1182(a)(28)(G)(v), no alien may be denied a visa or excluded from admission "because of any ... beliefs, statements, or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution of the United States." But this recent change in the law does not reach back to October 2, 1985, the date of the district director's decision, *i.e.*, the date from which Randall wants her adjustment to run. *See* 8 C.F.R. § 245.2(a)(5)(ii) (adjustment effective as of date of order approving the application). The section 901 change, by its express terms, applies only to applications for visas submitted during 1988, admissions sought after December 31, 1987 and before March 1, 1989, deportations based on conduct occurring in 1988, and deportations pending during 1988. Because Randall's 1984 application to the district director falls short of these time lines, the director, it seems, would still have section 1182(a)(28) as the legal frame Congress set for his decision. This state of things has confusion-breeding, conflict-generating potential, and renders a return to the district director hardly auspicious for Randall. We note here as well the statutory provision for rescission of a status adjustment if "it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status." 8 U.S.C. § 1256(a).

Our account of the adjustment of status regime, *see supra* pp. 473–75, and of the reasons why the district director currently is not well positioned to rehear Randall's 1984 application, *see supra* pp. 478–81, go a long way to explain our conclusion: judicial review of the questions whether and as of what date Randall's status should be adjusted is not yet in order. The strand of the ripeness doctrine we apply in this case is "very much a matter of practical common sense." *Continental Air Lines v. Civil Aeronautics Bd.*, 522 F.2d 107, 124 (D.C.Cir.1974) (en banc) (McGowan, J.); *cf. Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

Judicial appraisal of Randall's case is "likely to stand on a much surer footing" when the deportation proceedings have concluded, and in the interim, Randall faces "no irremediable adverse consequences." *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed. 2d 697 (1967). Those administrative proceedings, as the decision of the immigration judge already indicates, "may sharpen the controversy or remove the need for decision of at least some aspects of the matter." *See* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 78 (2d ed. 1988). Once the Board of Immigration Appeals has rendered its decision, Randall may proceed to the appropriate circuit court—in her situation, the Fifth or the Tenth Circuit, *see* 8 U.S.C. § 1105a(a)(2)—"by the normal appeal route." *See Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1501 (D.C.Cir.1988) (separate opinion filed by Mikva, J.).

It will be open to Randall to argue, if she takes "the normal appeal route," not only that she qualifies for permanent resident status *now, i.e.*, in 1988 by virtue of section 901 of the Foreign Relations Authorization Act, but that the court should order retroactive adjustment because (i) properly construed, subsection 1182(a)(28)(G)(v) never rendered her ineligible for a visa, or (ii) if section 1182(a)(28) did exclude her, as the immigration judge held it did, then the measure, as applied to her, must be regarded as null from the start because incompatible with the Constitution. We express no view on the merit of such argument.

In short, we do not find this controversy moot. Our disposition, affirming the district court's, defers, it does not deny,

Randall's right to obtain judicial review of subsection 1182(a)(28)(G)(v), a principal objective of her Complaint, and retroactive relief if her statutory construction or constitutional arguments prove persuasive. By ruling that she must take "the normal appeal route," we assure that eventual court review will be enlightened by a full record, including the Board of Immigration Appeals' decision, and that this court avoids premature blockage of, or interference with, regulatory actions Congress has assigned to other government bodies. We note in this regard that the district director's role in this matter has been assigned to him by the Attorney General's delegation, and not by the legislature's direction. We also note the fact, acknowledged by appellees, that Randall can assert the invalidity of the deportation proceedings in those proceedings themselves, and on circuit court review therefrom. Brief for Appellees at 25–26. And we recall Randall's own assertion that a court armed with equitable remedial authority can grant retroactive relief where necessary to "do complete rather than truncated justice." Appellants' Reply Brief at 16 (citing *Porter*

*v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)).[16]

### CONCLUSION

For the reasons stated, we disallow Randall's attempt to turn a preliminary, abbreviated administrative procedure intended as a convenience for the alien into a fulcrum to leverage judicial review while the matter still awaits the final agency ruling, made on a full record. Accordingly, the judgment of the district court dismissing the Complaint is affirmed. We reiterate that the dismissal is without prejudice to Randall's renewal of her claims at the conclusion of the administrative deportation process, and by the normal appeal route.

*It is so ordered.*

### APPENDIX *

### DECISION ON APPLICATION FOR STATUS AS PERMANENT RESIDENT

Section 245 of the Immigration and Nationality Act, as amended, provides that "The

16. The dissent would reverse the decision of our district court and remand the case forthwith to the district director with directions that he not exercise his discretionary powers in an unconstitutional manner. This solution encounters several obstacles.

First, the reviewability of district director status adjustment decisions is unsettled. *See supra* p. 479. The Supreme Court has indeed affirmed that when a district director *denies a stay of deportation,* judicial review is available and ordinarily lies initially in district court rather than in a court of appeals. *See Cheng Fan Kwok v. INS,* 392 U.S. 206, 210, 88 S.Ct. 1970, 1973, 20 L.Ed.2d 1037 (1968) (review in court was conceded; case raised "narrow question" whether the district court was a proper first forum for that review), *quoted in* the dissent at 489. But the Supreme Court has not yet grappled with the question whether, *outside the context of a deportation proceeding or order,* district director status adjustment or asylum application denials are amenable to court review. To treat the question cogently, one must face a historical obstacle. To this day, "decisions of United States consuls on visa matters are nonreviewable by the courts." *Centeno v. Shultz,* 817 F.2d 1212, 1214 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988). A district director's status adjustment decision, it has been observed, "simply provides a replace-

ment for traveling overseas to obtain an immigrant visa in the classic fashion, from a consular officer." T. ALEINIKOFF & D. MARTIN, *supra* p. 474, at 288.

Second, we disagree with the dissent on what the district director meant to convey and have therefore set out the director's decision in full in an appendix. Would the dissent allow room for the district director to say the dissent read him wrong? Is the director's decision as "subjective and unguided" as the dissent says it is, *see* dissent at 487, given the tenor of the statute the director had in full view, 8 U.S.C. § 1182(a)(28) (1982), an enactment that rendered excludable aliens who published writings advocating doctrines of world communism? *See supra* pp. 475–76. Under the general rule that as between successive judgments in separate proceedings, the second in time prevails, *see* RESTATEMENT (SECOND) OF JUDGMENTS § 15 (1982), has the decision of the immigration judge overtaken the decision of the district director to the extent that the two decisions conflict?

In sum, does the dissent, so quick to rule against Randall on questions we leave open for her to raise in the proper court, reach its own finishing line by end-running all the hurdles?

* This appendix reproduces the District Director's decision without alteration or correction.

status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence ..." (Emphasis Supplied).

The record reflects that the applicant was born on December 6, 1936, in New York, New York, and that she renounced her United States Citizenship at the American Embassy in Mexico City on July 13, 1967. This act of expatriation was confirmed by the United States Department of State on July 30, 1969, when the applicant was informed that she was ineligible for restoration to United States Citizenship. She is presently a citizen of Mexico.

The applicant last entered the United States at Miami, Florida on January 18, 1984, with a B–2 visitor's visa obtained on August 31, 1983, at Managua, Nicaragua. The Mexican passport of the applicant shows that this was her third entry into the United States using this visa.

The instant application was filed on March 14, 1984, and seeks permanent resident status based on an immediate relative visa petition which was filed on the same date by her United States Citizen husband, whom she married shortly after her last entry into the United States. The visa petition was approved on June 7, 1984.

During an interview on June 7, 1984 with the applicant, her husband and their attorney, the applicant was questioned concerning the facts surrounding the relinquishment of her United States Citizenship in 1967. Her response was that the action was taken primarily for economic reasons. She also indicated that she had been involved in certain activities that she is now regretting. Because the adjudicating officer was not satisfied that the applicant was not excludable under one or more provisions of section 212 of the Act, supra, an investigation was requested.

The investigation revealed that the applicant is a poet and a writer who has had several of her books published. On October 11, 1984, an investigator of this Service placed the applicant under oath and took a statement regarding her past activities subsequent to her expatriation and while she was living in Mexico, Cuba, and Nicaragua. It was determined that the applicant lived in Mexico from the time of her expatriation in 1966 to 1968, when anti-government activities during the student revolution forced her to flee Cuba. In 1961 she moved to Nicaragua.

Five of the applicant's books have been examined for the purpose of determining whether the applicant would be excludable under the provisions of 212(a)(28) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(28), which states in pertinent part (G) "Aliens who write or publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, publication, distribution, or display, any written or printed matter, advocating or teaching opposition to all organized government, or advocating or teaching (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either or specific individuals or officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury or destruction of property; or (iv) sabotage; or (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship; ...".

In *"Part of the Solution, Portrait of a Revolutionary"*, written by the applicant and published by New Directions Publishing Corporation in 1973, which is available from the public library under the biography section, Mr. Robert Cohen, a close associate who lived with the applicant for approximately 8 years in Mexico and Cuba provides this insight to the applicant. "Margaret (meaning the applicant, Margaret Randall) has been keeping a diary for over

a year and a half, since July '69 when we were forced into hiding in Mexico. The diary contains some of her best writing. And most useful". "This contrasts completely with the diary she kept as a kid, which is really one of the "pure products" of the Amerika (sic) Margaret has now dedicated her life to destroying".

Mr. Cohen continues in his introduction to expound on Ms. Randall's political activities and ideologies and further explains the purpose of the magazine that she, along with her ex-husband, published in Mexico. *"El Corno Emplumado"* (The Plumed Horn) is described as a publication that early in its history was devoted to a mini-anthology of Cuban revolutionary poetry. It appears that because of the publication, Ms. Randall began to meet many revolutionaires. In a trip to Cuba to attend the Cultural Congress of Havana in 1968 she was given a ring which was made from downed American Planes by the Vice–Minister of Culture of the Democratic Republic of Vietnam, Huy Can. Mr. Cohen states how the giving of this ring beautifully expresses solidarity with the American people and optimism about the outcome of *our* common struggle (emphasis supplied). After she returned from Cuba and the Cultural Congress, Ms. Randall together with Mr. Cohen, "... did the last couple of issues of El Corno together, changing the nature of the magazine, trying to make it a revolutionary weapon". Mr. Cohen met Ms. Randall in February 1968, and his total introduction into Ms. Randall's past comprises some 46 pages of her book.

The book has "Notes" from Ms. Randall's Diary 1970–71 in which she states the following on the dates indicated. "April 20–26 (The cane fields)."

"... Monday night we all listened to Fidel's speech at the funeral of the five men who lost their lives defending the nation against the recent mercenary attack near Baracoa. *Five of our men*". (emphasis supplied). "The attack only one of a more or less constant series over these past elev-

en years, but a big one. Stray mercenaries still being rounded up. Modern American weaponry". "We get the Voice of America Station clearly out here, and a local Miami station as well: the lies are fantastic ..." "Fidel was right-on as always. We felt the passion, and it released, to some extent, the anger in us all".

May 17–20:

"... All eyes and much of the world's anger were focused on the latest U.S. aggression: Cambodia". "... culminating in the assassination of the six blacks in Jackson and Atlanta and the four white middle-class students in Kent, Ohio".

"... The news broke Tuesday morning, and by dawn Friday spontaneous crowds had begun to gather before the Old American embassy building on the Havana seaside drive". "... It was natural that the offensive building should draw the people's protest ...".

"A day like any other today. To work early—around seven—then to see Robert at the hospital, ..., (Robert Cohen) to a meeting with a representative of *the party* at the Book Institute concerning an aspect of the book about women".[1] (Emphasis Supplied).

"... They tried to reach me at work. All the speakers at Sunday night's rally (where I spoke for North American revolutionaries) were invited to go out to the airport with the fishermen's families ..."

July 10:

"... Two experiences yesterday brought me closer to the Cubans in their Revolution in a way I hadn't experienced before": "... Representatives from the party and the Communist Youth showed us around, talking with the workers ..."

"The second experience took place after dinner when we went to a session of the people's court ..."

November 22:

"I'm every day confronted by the different growth the children experience here, in

**1.** *Cuban Women Now*, Margaret Randall, 1974 Published by The Women's Press, Printed by Hunter Rose in Toronto, Canada.

short: how communist they're becoming !" (In particular, Ms. Randall's child Gregory).

May 6:

"... even a congress of the Cuban Communist party (so long awaited, and the absence of which has been so absurdly criticized by some). The cultural policy has been defined, and a whole process is being unleashed, and it all fits together". "It's a very beautiful and exciting thing to watch, *and even more beautiful to participate in* ..." (emphasis supplied).

June 26:

"... In a long (eight to seven) workers' assembly yesterday, we discussed all the comrades' merits and demerits, and proposed, discussed, and voted from among our ranks for the growth of the "Vanguard Workers Movement". "It was the most profound and combative assembly we've had: people learning to really search each other out, in the healthiest ways. *I was moved and happy to be elected Vanguard Worker. Of the twenty-one workers in our collective, nine of us were elected* ..." (emphasis supplied).[2]

July 26:

"Fidel's July 26th speech just ended; ... tremendous effort and especially a new and more vigorous organization has raised production from ten percent ... to over fifty percent in certain areas! I felt that increase as my own, as our own ..."

Ms. Randall in this book refers to the Attica State Prison Riots in Attica, New York with her poem "I am Attica". In this poem she makes reference to the prisoners as brothers and the law enforcement officials as "Pigs". In one stanza of the poem she writes. "Maximum security amerikkka leading their minimum security sisters and brothers black, brown, and white together in one fierce cry of REVOLUTION ... REVOLUTION NOW!". She makes reference to the badge of the law enforcement

officials as "coward's shield", and the lies the law enforcement authorities make against "our truth". She writes, "monster Amerikka in the pit of her blackest cesspool gut ..."

September 13, 1971. "42 dead; 32 Rebels and 10 hostage guards, all killed by the coward power of The Man: ..."

In 1975, *Spirit of The People*, was written by the applicant and published by New Star Books 2504 York Ave. Vancouver 9, B.C. In the introduction to this book Ms. Randall describes the United States as the "... most powerful enemy humankind has known, (sic) ..." "The Vietnamese victory of January 27, 1973, was decisive for us all ..." She states that on September–October 1974, she was privileged to be invited by the Women's Union[3] to visit the DRV.

She refers to the, "U.S. War Criminals," and the evacuation of Vietnamese children as "... this latest U.S. crime; the kidnapping of Vietnamese Children, forcing them to the land of their murderers, robbing them of their homeland, their parents, their culture".

"The war is over and the Vietnamese Revolution has won its greatest victory. U.S. imperialism has suffered it's greatest defeat, a strategic turning-point in its decline". The above written in Havana in June, 1975.

This book has numerous references to her comrades of North Vietnam and describes the "... constant enemy in the sky (the Phantoms and the B–52's)."

The national concern over subversive aliens entering this country has continuously expanded the measures barring their entry to the United States. Dating from 1903, Congress has seen fit to enact legislation barring entry to those aliens whose presence is deemed detrimental to the national interest of the United States. Until 1940 the statute reached only those who presently advo-

---

**2.** ibid: page 367, "A MILITANT—is a member of a selective political organization. In Cuba these are the young Communists and the Cuban Communist Party Members.... Militants form the *vanguard* within the revolutionary process: they hold the total respect and confidence of their comrades". (emphasis supplied).

**3.** Vietnam Women's Union, founded in 1930 along with the Vietnam Workers Party (Communist).

cated or who presently were members or affiliates of organizations which advocated violent overthrow of the United States Government. The Alien Registration Act of 1940 expounded this exclusion provision by adding aliens who at any time had advocated or belonged to organizations advocating the prohibited doctrines. In 1950 the Internal Security Act specifically named the Communist Party and banned aliens who at any time had been members of that organization or its sections or affiliates. (Sec. 22, Internal Security Act of 1950, 64 Stat. 987).

In Gordon and Rosenfields's *Immigration Law and Procedure*, it is noted that "The precise ambit of the statutory reference to affiliation is not easy to define". In *Kettunen v. Reimer*, 79 F.2d 315 (2nd Cir.1935), the court found that affiliation connoted

"A status of mutual recognition that he may be relied on to cooperate with the Communist Party on a fairly permanent basis ... Affiliation includes an element of dependability upon which the organization can rely ..."

This expression was cited with apparent approval in *Bridges v. Wixon* 326 U.S. 135, 143, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), where the court found that affiliation imports

"less than membership but more than sympathy ... But he who cooperates with such an organization only in its wholly lawful activities cannot by that fact be said as a matter of law to be "affiliated" with it ... Whether intermittent or repeated, the act or acts tending to prove "affiliation" must be of that quality which indicates an adherence to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from mere cooperation with it in lawful activities. The act or acts must evidence a working alliance to bring the program to fruition".

In *Matter of G.*, 5 I & N Dec. 112, it was held that an alien who, although not a member of the Communist Party, was a sympathizer with its principles, who subscribed to and sold the Daily Worker, distributed Communist literature and made speeches in behalf of The Party is deemed to have been affiliated with the Communist Party. The membership rolls of the Communist Party are not open to public scrutiny and the applicant has denied that she was a member of the Communist Party.

By her own admission, the applicant has made speeches for The Communist Party. Her books advocate the doctrines of communism and support the Communist governments of Cuba, Vietnam and Nicaragua from 1966 to 1981. There are constant references to the United States as "the enemy" in her books. A close associate, with whom she lived for approximately eight years, refers to "... the Amerika that Margaret has now dedicated her life to destroying". The extent of the applicant's support and sympathy for the Communist governments of Cuba, Vietnam and Nicaragua, and her activities while residing in those countries, can only be determined from her own statements and those of her close friends and associates.

Benefits under section 245 of the Act, supra, are discretionary. There are numerous decisions relating to the discretionary authority of the Attorney General in the adjudication of applications for adjustment of status. See *Matter of Marques*, 16 I & N Dec. 314, (BIA 08–17–77); *Matter of Ibrahim*, 18 I & N Dec. 55, (BIA 05–18–81); *Matter of Leung*, 16 I & N Dec. 12, (D.D. 09–18–76); *Matter of Ortiz–Prieto*, 11 I & N Dec. 317, (BIA 07–16–65). All of these decisions, with others, point out that even though the applicant appears to be statutorily eligible for the benefits under Section 245 of the Act, the grant of an application is a matter of discretion and administrative grace. Furthermore, the applicant has the burden to show that discretion should be exercised in her behalf. See also *Matter of Arai*, 13, I & N Dec. 494. (BIA March 4, 1970).

The record of the applicant is self-evident. She has failed to show that she is clearly and beyond a reasonable doubt entitled to the benefits for which she has applied. Her activities and writings for nearly the past 20 years speak for themselves. Her

writings go far beyond mere dissent, disagreement with, or criticism of the United States or its policies. Her associations with, and her activities and writings in support of the communist dominated governments of Cuba, North Vietnam, and Nicaragua; and her advocacy and support of revolutionary activity in Mexico, as well as her affiliation with and participation in Communist Party activities, warrant the denial of her application for adjustment of status as a matter of discretion.

For the foregoing reasons, favorable exercise discretion is not warranted in this case.

Your pending application for adjustment of status is hereby DENIED.

MIKVA, Circuit Judge, dissenting:

Appellant Randall would, I am convinced, have obtained the status adjustment she seeks but for a government official's unconstitutional action. The record indicates that the district director ruled that she was statutorily eligible for a status adjustment, but decided that he would not grant it because he disapproved of her writings and associations. The majority holds that Randall's claim is not ripe and that she must pursue her claim at a later time in other courts. But it minimizes the crucial importance of the citizenship right at stake. As the Supreme Court has noted, "[a] person threatened with deportation cannot be denied the right to challenge the constitutional validity of the process which led to his status merely on the basis of speculation over the availability of other forms of relief." *INS v. Chadha*, 462 U.S. 919, 937, 103 S.Ct. 2764, 2777, 77 L.Ed.2d 317 (1983). I think appellant's claim is ripe now. Moreover, I am not at all convinced that the appeals route outlined by the majority will enable Randall *ever* to get full relief for her injury. For these reasons, I respectfully dissent from today's decision.

### I.

The unconstitutional action at issue in this case was the district director's decision to use his discretion to deny Randall's status adjustment because of his dislike for her writings and associations. That the district director based his denial of discre-

tion on these factors is set forth clearly in his decision. He stated that Randall's "writings go far beyond mere dissent, disagreement with, or criticism of the United States or its policies." Appendix at 34. He concluded that those writings, "as well as her affiliation with and participation in Communist Party activities, warrant the denial of her application for adjustment of status as a matter of discretion." *Id.*

Allowing a discretionary decision of whether to grant a status adjustment to turn on a government official's subjective and unguided reaction to an individual's writings violates the requirement that delegations in the first amendment area provide "narrowly drawn, reasonable and definite standards for the [decisionmakers] to follow." *Niemotko v. Maryland*, 340 U.S. 268, 271, 71 S.Ct. 328, 329, 95 L.Ed. 280 (1951); *see also Cox v. Louisiana*, 379 U.S. 536, 557, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965); L. Tribe, *American Constitutional Law* 1056 (2d ed. 1988) ("[T]he general rule [is] that, while legislatures 'ordinarily may delegate power under broad standards ..., [the] area of permissible indefiniteness narrows ... when the regulation ... potentially affects fundamental rights,' like those protected by the first amendment.") (citing *United States v. Robel*, 389 U.S. 258, 274–75, 88 S.Ct. 419, 429, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring)).

It strikes me as clear from the district director's decision that, but for this unconstitutional determination, he would have granted Randall's status adjustment. He states in the decision, before rejecting the adjustment on discretionary grounds, that "the applicant appears to be statutorily eligible...." The majority expends considerable energy in attempting to show that the district director did not really mean by this statement that Randall is statutorily eligible. I do not understand why he did not mean what he said.

First, the majority attempts to use the *Bagamasbad* case for the proposition that because the district director *could* have exercised discretion before he ruled on statutory eligibility, it is "imaginative, but implausible" to suggest that he ruled on stat-

utory eligibility first. Maj.Op. at 480. The *Bagamasbad* case reviewed a situation in which it was conceded by all sides that the district director did not make a determination about statutory eligibility. *See Bagamasbad v. INS*, 531 F.2d 111, 113 (3d Cir.), *rev'd*, 429 U.S. 24, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976). The Supreme Court merely held that the district director was not *required* to make a determination of statutory eligibility. In the case at bar, the district director *did* make a determination that Randall was statutorily eligible before exercising his discretion. The fact that he was not required to do so does not negate this fact.

Second, the majority asserts that "the most likely reading of the director's full statement is that he intended the words 'the applicant' to refer to applicants in general, not applicant Randall in particular." Maj.Op. at 480. The full text of the district director's decision, however, refutes such a reading. The reference to "the applicant" at issue here is sandwiched between uses of those same words that indisputably refer to Randall. A longer quotation will illustrate:

> By her own admission, *the applicant* has made speeches for the Communist Party. Her books advocate the doctrines of communism and support the Communist governments of Cuba, Vietnam and Nicaragua from 1966 to 1981. There are constant references to the United States as "the enemy" in her books. A close associate, with whom she lived for approximately eight years, refers to "... the Amerika that Margaret has now dedicated her life to destroying". The extent of *the applicant's* support and sympathy for the Communist governments of Cuba, Vietnam and Nicaragua, and her activities while residing in these countries, can only be determined from her own statements and those of her close friends and associates.
>
> Benefits under section 245 of the Act, supra, are discretionary. There are numerous decisions relating to the discretionary authority of the Attorney General in the adjudication of applications for adjustment of status. [Cases omitted].

> All of these decisions, with others, point out that even though *the applicant* appears to be statutorily eligible for the benefits under Section 245 of the Act, the grant of an application is a matter of discretion and administrative grace. Furthermore, *the applicant* has the burden to show that discretion should be exercised in her behalf. [Case omitted]. The record of *the applicant* is self-evident. She has failed to show that she is clearly and beyond a reasonable doubt entitled to the benefits for which she has applied. Her activities and writings for nearly the past 20 years speak for themselves.

Appendix at 486–87 (emphasis added). It is clear that the phrase "the applicant" applies to Randall. Yet the majority maintains that the phrase has a generic quality. This reading is not credible if the opinion is read without the active second-guessing in which the majority engages.

Finally, the majority contends that even if the statement did refer to Randall, it is not a "conclusive pronouncement" because of the use of the words "appears to be" in the statement "appears to be statutorily eligible for the benefits under Section 245 of the Act." But the phrase "appears to be" is a standard English way of expressing what one believes to be true. *Cf. Webster's Third New International Dictionary* 103 (1981) (to "be obvious or evident" as a definition of "appear"). This is a particularly common usage among government decisionmakers: when a bureaucrat pronounces that "your papers appear to be in order," he is indeed making a "conclusive pronouncement." Moreover, even if the use of the phrase "appears to be statutorily eligible" is not an ideal way to say that Randall is statutorily eligible, it is clearly a far *worse* way of stating that the district director is *withholding* a determination about whether Randall is eligible, as the majority would have it.

When these ultimately unconvincing arguments are cast aside, we are left with the district director's own words: "the applicant appears to be statutorily eligible...." Absent any compelling reason to

believe that he did not mean what he wrote, I think that we can only conclude that he found Randall to be statutorily eligible for a status adjustment. That being the case, Randall was denied her status adjustments due entirely to the unconstitutional action of the district director.

## II.

The majority states with considerable candor that if the district director *had* found Randall statutorily eligible, "the rest of her argument would have more force." Maj.Op. at 479. With that much of the majority opinion I do agree. Randall has suffered real injury as a result of the district director's actions. The administrative appeals that are pending have no prospect of giving her full relief. I am skeptical that the court of appeals that would ultimately hear the claim will be able to do so either, and in any case do not believe that Randall should have to follow that route to vindicate her rights. It is clear that Randall "has demonstrated 'injury in fact and a likelihood that the judicial relief requested will prevent or redress the claimed injury.'" *Chadha*, 462 U.S. at 936, 103 S.Ct. at 2776 (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978)). I see no reason to refrain from resolving her claim immediately.

The majority asserts that Randall's case is now on something it calls "the normal appeal route." But the administrative appeal that Randall is now pursuing is entirely separate from and has no bearing on the district director's decision. *See* 8 C.F.R. § 245.2(a)(5)(ii) (1987) ("No [administrative] appeal lies from the denial of an application [for an adjustment of status] by the district director."). To the contrary, the Supreme Court has held that appeals from a decision of a district director "ordinarily lie first in an action brought in an appropriate district court." *Cheng Fan Kwok v. INS*, 392 U.S. 206, 210, 88 S.Ct. 1970, 1973, 20 L.Ed.2d 1037 (1968); *see also Jaa v. INS*, 779 F.2d 569, 571 (9th Cir.1986) (district court has jurisdiction "to review a denial of status adjustment"). Such an appeal was properly taken in the instant case, and Randall had every reason to expect that we would review the decision of the district court. As the court below correctly noted, the mere fact that deportation proceedings have been commenced is not reason for us to decline to review an erroneous ruling of the district court. *Randall v. Meese*, No. 85–3415, slip op. at 9 (D.D.C. June 5, 1987) ("The Court cannot adopt defendants' myopic viewpoint concerning a district court's jurisdiction to review abuses by a district director; whether the request [for status adjustment] is considered anew in the deportation proceedings should not *ipso facto* shield the district director's actions."). The mere fact that the district director's unconstitutional decision was one that put appellant's claim on a new administrative track with appellate procedures of its own should not deprive her of the opportunity to challenge it directly.

Randall has been injured by the district director's decision in a manner that cannot be fully remedied by the appeals path toward which the majority has directed her. An applicant for citizenship must satisfy a three-year residency requirement for naturalization. *See* 8 U.S.C. § 1430(a). The loss of time toward residence requirements has been recognized as a real injury. *See Chadha v. INS*, 634 F.2d 408, 417 n. 6 (9th Cir.1980) ("By this difference in dates when permanent resident status is granted, Chadha . . . retains a personal interest in the disposition of this petition . . ."), *aff'd, INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *see also INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1210 n. 3, 94 L.Ed.2d 434 (1987). Randall has suffered such a loss in the instant case.

It is undisputed that the administrative body before which Randall's appeal is now pending cannot accord her full relief for this injury. If the district director had not exercised his discretion in an unconstitutional manner, he would have found Randall eligible on or about October 2, 1985. She would then have been eligible for citizenship three years from that date. To make her whole—to make her a citizen at the same time she would have been had the district director acted properly—

Randall would require retroactive relief. The BIA, however, has held that it does not have the power to grant retroactive relief. *See Matter of Talanoa,* 13 I & N Dec. 161 (BIA 1969), *aff'd,* 427 F.2d 1143 (9th Cir. 1970); *Matter of Palmieri,* 10 I & N Dec. 187 (BIA 1963); *see also Dong Sik Kwon v. INS,* 646 F.2d 909, 917 (5th Cir.1981) ("Although discretion is given to the Attorney General to admit applicants, he has no authority to act retroactively on an application.").

The majority does not mention this fact and states simply that when this decision is eventually appealed to a court of appeals "[i]t will be open to Randall to argue" that her relief should be retroactive to that point, although it "express[es] no view on the merit of such argument." Maj.Op. at 481. I doubt that a court of appeals reviewing the BIA's decision could decide to grant retroactive relief. Moreover, I am skeptical that Randall's case will even be heard by a body capable of giving full relief in time to grant her such relief. Had the district director granted Randall's adjustment of status initially, her three-year residency period would conclude on or about October 2, 1988. She would be eligible to become a citizen at that time. Considering that the BIA has not yet ruled, and that even when it does it cannot grant retroactive relief, it is unlikely in the extreme that a court capable of granting retroactive relief will even *rule* on the case before the date on which Randall would have become a citizen. I strongly differ with the majority's assertion that "Randall faces 'no irremediable adverse consequences.'" Maj.Op. at 481 (citation omitted).

The majority rightly points out that ripeness doctrine is "very much a matter of practical common sense." *Continental Air Lines, Inc. v. Civil Aeronautics Bd.,* 522 F.2d 107, 124 (D.C.Cir.1974) (en banc). I see no common-sense reason for this court to refrain from deciding Randall's claim at this time. She has been deprived of a status adjustment for an unconstitutional reason by a decisionmaker from whom there is no administrative appeal. Appeal from that decision is properly to the district court and then to this court. Her case is now in the hands of an administrative body that, because it has held that it cannot order retroactive relief, cannot grant her full relief for her injury. In light of that inability, I find it particularly noteworthy that the majority, in rejecting Randall's claims, nevertheless holds itself out as her champion. *See* Maj.Op. at 482 n. 16 (stating that the dissent is "so quick to rule against Randall on questions we leave open for her to raise in the proper court"). With friends like this, Randall certainly does not need enemies. I believe that "practical common sense" dictates that we take the appeal now and begin to remedy Randall's injury. I would reverse the decision below and remand the case to the district director with directions that he not exercise his discretionary powers in an unconstitutional manner.